RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0179p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────

THE NORTHEAST OHIO COALITION FOR THE HOMELESS; SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 1199; COLUMBUS COALITION FOR THE HOMELESS;

　　　　*Plaintiffs-Appellees/Cross-Appellants*,

OHIO DEMOCRATIC PARTY,

　　　　*Intervenor-Appellee/Cross-Appellant*,

　　*v.*

JON HUSTED, in his official capacity as Secretary of the State of Ohio,

　　　　*Defendant-Appellant/Cross-Appellee*,

STATE OF OHIO,

　　　　*Intervenor-Appellant/Cross-Appellee*.

Nos. 14-4083/ 4084/ 4132/ 4133/ 15-3295/ 3296/ 3380/ 3381

─────────────

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:06-cv-00896—Algenon L. Marbley, District Judge.

Argued: April 28, 2016

Decided and Filed: August 1, 2016

Before: MERRITT, SUHRHEINRICH, DONALD, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Zachery P. Keller, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants/Cross-Appellees. Sandhya Gupta, THE CHANDRA LAW FIRM, LLC, Cleveland, Ohio, for Appellees/Cross-Appellants Northeast Ohio Coalition for the Homeless and Ohio Democratic Party. Stephen P. Berzon, ALTSHULER BERZON LLP, San Francisco, California, for Appellees/Cross-Appellants Service Employees. **ON BRIEF:** Zachery P. Keller, Ryan L. Richardson, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants/Cross-Appellees. Sandhya Gupta, Subodh Chandra, THE CHANDRA LAW FIRM, LLC, Cleveland, Ohio, Caroline H. Gentry, PORTER, WRIGHT, MORRIS & ARTHUR LLP,

Dayton, Ohio, Donald J. McTigue, Mark A. McGinnis, J. Corey Colombo, MCTIGUE MCGINNIS & COLOMBO, LLC, Columbus, Ohio, for Appellees/Cross-Appellants Northeast Ohio Coalition for the Homeless and Ohio Democratic Party. Stephen P. Berzon, ALTSHULER BERZON LLP, San Francisco, California, for Appellees/Cross-Appellants Service Employees. Frederick M. Gittes, Jeffrey P. Vardaro, THE GITTES LAW GROUP, Columbus, Ohio, Barbara D. Bonar, LAW OFFICES OF B. DAHLENBURG BONAR, Covington, Kentucky, Jon M. Greenbaum, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, Washington, D.C., Freda J. Levenson, ACLU OF OHIO FOUNDATION, INC., Cleveland, Ohio, Kathleen L. Bogas, BOGAS & KONCIUS, P.C., Bingham Farms, Michigan, Jennifer B. Morton, JENNIFER MORTON LAW, PLLC, Knoxville, Tennessee, Jacqueline Greene, FRIEDMAN & GILBERT, Cleveland, Ohio, for Amicus Curiae.

---

**OPINION**

---

SUHRHEINRICH, Circuit Judge.

## I. OVERVIEW

Months before the 2012 presidential election, based on a change in state law, Defendants State of Ohio and Secretary of State John Husted (collectively, "Defendants") sought to undo a federal consent decree ("Decree") that required Ohio to count provisional ballots cast by voters who appeared in the correct polling location but lacked certain identification and further required Ohio to count ballots cast in the right polling place but wrong precinct due to poll-worker error. In two related cases, *NEOCH v. Husted* (*NEOCH*) and *SEIU Local 1 v. Husted* (*SEIU Local 1*),[1] Plaintiffs (NEOCH Plaintiffs; SEIU Local 1 Plaintiffs; collectively, "Plaintiffs") successfully defended the Decree and obtained an extension of it for one presidential cycle (*NEOCH*) and further obtained statewide preliminary and permanent injunctive relief requiring Ohio to count these votes (*SEIU Local I*).

This appeal involves three attorneys' fee motions under 42 U.S.C. § 1988 in the two related cases. Specifically, Plaintiffs seek attorneys' fees and costs stemming from (1) their work in 2012 defending the Decree, (2) their work in 2013 obtaining an extension of the Decree,

---

[1]*NEOCH v. Husted*, Case No. 2:06-cv-896; *SEIU Local 1 v. Husted*, Case No. 2:12-cv-00562.

and (3) for the SEIU Plaintiffs, the work performed to obtain a preliminary injunction in 2012 and a permanent injunction in 2013. Using the lodestar method, the district court awarded fees to Plaintiffs in both cases. The district court, however, limited the fees to recover the costs of pursuing fees to 3% of the main case pursuant to the *Coulter* rule. *See Coulter v. Tennessee*, 805 F.2d 146, 151 (6th Cir. 1986) (setting a cap on fees for fees).

On appeal Defendants argue that the district court abused its discretion because its award—$2 million in fees to twenty-five attorneys for over 6,000 hours in the two cases—was not "reasonable" within the meaning of § 1988. Plaintiffs cross appeal the district court's application of the *Coulter* rule, claiming that "unusual circumstances" warrants a higher percentage. Plaintiffs, joined by Amici,[2] challenge the continued vitality of *Coulter* in light of *Commissioner, I.N.S. v. Jean*, 496 U.S. 154 (1990).

For the reasons that follow, we AFFIRM the hours and rates awarded by the district court with the exception of the rates awarded to a contingent of attorneys from California. We also abrogate the *Coulter* 3% cap on fees for fees because the rule is inconsistent with intervening Supreme Court authority.

## II. BACKGROUND

As the district court and this court recognized, "the consent decree arose from the 'turbulent saga of Ohio's provisional voting regime' that began in 2006 when Ohio enacted comprehensive election reforms." *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 584 (6th Cir. 2012) [hereinafter *NEOCH*] (per curiam) (quoting No. 2:12-CV-562, R. 67, Plenary Op & Order at 2). A detailed history of the Decree can be found in our opinion in *Hunter v. Hamilton County Board of Elections*, 635 F.3d 219, 223-24 (6th Cir. 2011). This court has also recounted many of the events that underlie the fee award at issue. *See NEOCH*, 696 F.3d 580 (affirming the district court's denial of motion to vacate Decree; affirming most of its grant of a

---

[2]Brief of Amici Curiae includes the Kentucky Employment Lawyers Association, the Michigan Employment Lawyers Association, the Ohio Employment Lawyers Association, the Tennessee Employment Lawyers Association, the Lawyers' Committee for Civil Rights Under Law, the ACLU of Ohio, and the Ohio Chapter of the National Lawyers Guild.

preliminary injunction). Because it is essential to determining whether the district court abused its discretion in making its three fee awards, we must give a rather detailed account of the motions and proceedings upon which the awards were based.

## A.  *NEOCH* **Lawsuit and 2010 Consent Decree**

In 2006, the Ohio General Assembly amended Ohio's Election Code to require that voters provide one of several types of identification in order to cast a regular ballot in state and federal elections in Ohio. That same year, the Northeast Ohio Coalition for the Homeless (NEOCH) and the Service Employees International Union Local 1199 brought an action under 42 U.S.C. § 1983 against the Ohio Secretary of State challenging the constitutionality of several provisions of the newly-enacted voter identification and provisional ballot laws. The State of Ohio intervened on behalf of the people of Ohio and the General Assembly (collectively, "Defendants"). *See NEOCH v. Blackwell*, 467 F.3d 999, 1002-04 (6th Cir. 2006).

On April 19, 2010, the district court entered a consent decree ("Decree") between the parties. Although it stopped short of finding constitutional violations, the Decree mandated that the Board of Elections not reject provisional ballots cast by voters using only the last four digits of the voter's social security number as identification that, due to poll-worker error, were cast (1) in the correct polling place but wrong precinct, or (2) with nonconforming or incomplete ballot affirmations (SSN-4 voters). The Decree was "final and binding," but any of the parties could file a motion to modify, extend, or terminate the Decree for good cause shown. The Decree was valid through June 30, 2013. *See NEOCH*, 696 F.3d at 584, 601-02.

Ohio followed the Decree in the 2010 and 2011 general elections and the 2012 primary.

## B.  **2012 Proceedings Relating to the** *NEOCH* **2010 Consent Decree**

### 1.  *NEOCH* **Motion to Enjoin State Court Proceedings**

In 2011, the Ohio Supreme Court ruled that provisional ballots cast in the wrong precinct must be summarily disqualified if due to poll-worker error even if the voter was not at fault. *Ohio ex rel. Painter v. Brunner*, 941 N.E.2d 782, 794 (Ohio 2011) (per curiam). On April 16,

2012, the Ohio Senate President and House of Representatives Speaker Pro Tempore (jointly, "Relators") filed a writ of mandamus in the Ohio Supreme Court seeking a declaration that the Decree was inconsistent with Ohio law. In response, on May 8, 2012, the *NEOCH* Plaintiffs moved in the district court for an injunction under the All Writs Act to prohibit the Relators from collaterally attacking the Decree and, in the alternative, an order to show cause why the Relators should not be held in contempt. The Relators did not oppose the motion, and Defendants took no position.

On May 9, 2012, the district court held a telephone status conference with counsel for Plaintiffs, the Relators, the State of Ohio, and the Secretary of State. The court ordered an expedited response brief from the Relators. On May 10, 2012, the district court held an additional status conference with the same parties and announced its ruling. On May 11, 2012, the district court issued a 17-page opinion granting Plaintiffs' motion to enjoin the state court proceedings and ordering the Relators to dismiss their suit in state court. (May 11, 2012 Op.). First, the district court concluded that it had jurisdiction over the nonparty Relators, who were acting on behalf of the State of Ohio, a named party to the Decree, and that it had the power under the All Writs Act, 28 U.S.C. § 1651, to enforce its judgment against nonparty interference in any event. The court also rejected the Relators' argument that the Anti-Injunction Act, 28 U.S.C. § 2283, prohibited the court from enjoining their mandamus action. The district court held that the requested relief was warranted given the Relators' "extraordinary act of lodging a direct collateral attack on a Consent Decree of this Court." The Relators subsequently dismissed their suit in the Ohio Supreme Court.

## 2. Defendants' Request to Vacate Decree

Defendants asked the district court to invalidate the Decree, claiming it conflicted with state law. Defendants also argued that the Decree was void *ab initio* because the Secretary of State lacked the unilateral authority to abrogate state law absent a constitutional violation. On May 17, 2012, the district court ordered expedited briefing on the threshold issue of the legal validity of the Decree. The court held a merits hearing on June 27, 2012. On July 9, 2012, the district court issued a decision rejecting Defendants' request to vacate the Decree. (July 9, 2012

Op.). Specifically, the court (1) rejected Defendants' argument that the Decree irreconcilably conflicted with state law; (2) held that Rule 60(b) governed Defendants' motion to vacate the decree; and (3) ruled that Defendants had not shown grounds for relief under Rule 60(b)(4) and (b)(5) because they had failed to show that the Decree was no longer necessary to prevent constitutional violations.

### 3. *NEOCH* Motion to Modify the Decree

On June 20, 2012, while Defendants' request to vacate the Decree was still pending, the *NEOCH* Plaintiffs filed a motion to modify the Decree to prevent further constitutional violations, including alleged equal protection problems caused by counties' application of disparate standards in implementing the Decree. The *NEOCH* Plaintiffs asked the court to expand the Decree to protect *all* Ohio voters who cast "correct location, wrong precinct" ballots, not just SSN-4 voters.

### C. *SEIU Local 1* Motion for Preliminary Injunction

On June 22, 2012, a separate group of Plaintiffs, the Service Employees International Union (*SEIU Local 1* Plaintiffs), represented by some overlapping counsel, filed a separate action alleging that Ohio's strict application of the disqualification rules to ballot deficiencies caused by poll-worker error violated the Fourteenth Amendment's Equal Protection and Due Process Clauses. The *SEIU Local 1* Plaintiffs also alleged that the Decree's preferential treatment of SSN-4 wrong-precinct ballots violated equal protection. Finally, the *SEIU Local 1* Plaintiffs sought relief for voters who failed to properly sign ballot affirmations (deficient-affirmation ballots). The *SEIU Local 1* Plaintiffs sought a preliminary injunction, arguing that the Ohio election laws burdened the fundamental right to vote and did not serve sufficient state interests. The *SEIU Local 1* Plaintiffs proposed "remaking" wrong-precinct provisional ballots to cast only "upballot" votes, or votes in eligible races.

Because the two cases were similar and sought parallel relief, the district court deemed them related, and on June 27, 2012, heard joint arguments on the *NEOCH* Plaintiffs' motion to modify and the *SEIU Local 1* Plaintiffs' motion for a preliminary injunction.

**D. District Court Rulings on *SEIU Local 1* Preliminary Injunction Motion and *NEOCH* Motion to Modify**

On August 27, 2012, the district court issued a preliminary injunction in *SEIU Local 1 v. Husted*, ordering Defendants to count all wrong-precinct provisional ballots unless there was affirmative evidence that the poll worker properly performed his or her duties, and to count all provisional ballots with technical errors in the ballot envelope. (Aug. 27, 2012 Op. or "Plenary Op. & Order"). The district court's 58-page Plenary Opinion and Order premised injunctive relief upon three likely equal protection violations and a likely due process violation. *NEOCH*, 696 F.3d at 585.

First, the district court addressed the equal protection claim based on wrong-precinct ballots caused by poll-worker error. This court described the proceedings in the district court:

> Beginning with the SEIU plaintiffs' wrong-precinct ballots claim, the court found reliable evidence that Ohio's county election boards disqualified thousands of wrong-precinct ballots in each of Ohio's three most recent elections. Specifically, the court found that Ohio rejected more than 14,000 wrong-precinct ballots in 2008 and 11,000 more in 2010, with wrong-precinct rejections occurring in the vast majority of Ohio counties. (Plenary Op. & Order at 26 & n.28, 27 (counting 14,335 wrong-precinct rejections in 2008 and 11,775 in 2010).) And in the mid-cycle election of 2011, which involved no federal races, Ohio kept specific data regarding right-place/wrong-precinct ballots revealing that Ohio disqualified more than 1,800 such ballots. But for the consent decree entered in the *NEOCH* litigation, Ohio would have disqualified another 1,500 such ballots. (*Id*. at 25–26 (finding that Ohio disqualified 1,826 of 3,380 right-place/wrong-precinct ballots in 2011).) This data led the court to conclude that "[w]hile the number and frequency of wrong-precinct ballot disqualifications vary county to county, the problem as a whole is systemic and statewide." (*Id*. at 26.) The court noted that "[m]uch of the factual basis upon which the Court relies for its findings is uncontested, or has already been established by this Court or the courts in [the *Hunter* litigation]." (*Id*. at 25.)
>
> Though the Secretary did not dispute the accuracy of these statistics, it challenged their relevance in light of recent efforts to improve Ohio's provisional ballot system. The Secretary also argued that reasons other than poll-worker error may have caused some of the wrong-precinct ballots. The district court rejected these arguments, citing the failure of previous state directives and the absence of evidence that voters disobeyed poll-worker instructions regarding voting precincts. "No party," it stated, "has identified a single example, from the past

four years' elections, of a wrong-precinct provisional ballot being cast because the voter refused to vote in the correct precinct." (*Id*. at 29.)  Invoking poll workers' statutory mandate to direct voters to the correct precinct and inform them that wrong-precinct votes will not count, *see* O.R.C. § 3505.181(C)(1), the district court reasoned, "It is common sense that no rational voter who arrives at the correct polling place would ever refuse to cast a provisional ballot in the correct precinct. . . ."  (Plenary Op. & Order at 29.)  "Based on the record evidence provided thus far," the court concluded that "Plaintiffs ha[d] established a strong likelihood that thousands of lawfully-registered voters will be completely deprived of their right to vote under Ohio Rev. Code § 3505.183(B)(4)(a)(ii) in the upcoming election because of poll-worker error." (*Id*. at 30.)

*NEOCH*, 696 F.3d at 586.

The district court then weighed this burden against the state interests justifying the automatic disqualification of wrong-precinct provisional ballots under the balancing test established by *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).  Defendants relied on the "significant and numerous" advantages of the precinct voting system articulated in *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 569 (6th Cir. 2004) (per curiam): (1) capping the number of voters at a polling place, (2) limiting the precinct ballot to applicable elections, (3) making the precinct ballot less confusing, (4) simplifying election administration, and (5) allowing the state to place polling locations closer to voter residences.  *NEOCH*, 696 F.3d at 586-87.  The district court found these factors inapposite to the facts at hand or unsupported by the record evidence.  The district court also determined that Ohio's disqualification of right-place/wrong-precinct provisional ballots constituted invidious discrimination because "the restriction bore no relation to those voters' qualifications." *Id*. at 587.

Second, the district court considered the equal protection argument based on deficient-affirmation ballots caused by poll-worker error.  The court attributed these deficiencies, including missing or misplaced printed names or signatures, to poll-worker error "because it is the poll worker's duty to ensure that provisional ballots are cast with a validly completed ballot envelope and affirmation." *Id*. (citing Plenary Op. & Order at 43 (citing O.R.C. §§ 3505.181(B)(2)-(3), 3505.182)).  The court found the State's proposed interests in rejecting

ballots with these affirmation deficiencies—the same *Sandusky* interests discussed above—insufficient to support the burden on these voters. *Id*. at 587-88.

Third, the district court evaluated the equal protection argument based on the Decree's preferential treatment of SSN-4 ballots. We noted that

> the district court agreed with the SEIU plaintiffs that Ohio's differential treatment of wrong-precinct ballots, depending on the form of identification used to cast the ballot, violated equal protection. Recognizing that the *NEOCH* consent decree provided a different vote-counting standard for SSN–4 provisional ballots (allowing a chance to prove poll-worker error and have the vote counted) and all other provisional ballots (not), the court inquired whether state interests justified the preferential treatment. The State—by now seeking to vacate the consent decree—offered none, and the court agreed, finding "[t]here is no reason for treating provisional ballots differently based on the type of identification used." (*Id*. at 49.)

*Id.* at 588.

Fourth, the district court addressed the due process argument based on wrong-precinct ballots caused by poll-worker error. We observed that "the [district] court adopted *dicta* from the post-remand judgment in the *Hunter* litigation that Ohio's strict disqualification of deficient ballots, regardless of poll-worker error, rendered the election system 'fundamentally unfair,' in violation of due process." *Id.* (citing *Hunter v. Hamilton Cty. Bd. of Elections*, 850 F. Supp. 2d 795, 847 (S.D. Ohio 2012)). Thus, "[r]elying on the same evidence discussed in the equal protection claims," the district court found a strong likelihood of success in the *SEIU Local* Plaintiffs' due process claim. *Id.*

The district court therefore concluded that the equitable factors warranted the grant of a preliminary injunction requiring the Secretary to count correct-location/wrong-precinct and deficient-affirmation provisional ballots unless the State could prove that the poll worker advised the voter to cast the ballot in the correct precinct and the voter refused. *Id.*

Because the preliminary injunction in *SEIU Local 1 v. Husted* granted the same equitable relief requested by the *NEOCH* Plaintiffs' motion to modify, the district court stayed the

*NEOCH* Plaintiffs' motion to modify the decree as moot, subject to renewal if warranted for good cause.

### E. This Court's Expedited Appeals from Denial of Motion to Vacate the*NEOCH* Decree and the *SEIU Local 1* Preliminary Injunction

Defendants appealed the denial of the motion to vacate the *NEOCH* Decree and the *SEIU Local 1* preliminary injunction. This court expedited briefing in both appeals—which were not consolidated—and ordered an expedited telephonic oral argument to be held on October 1, 2012.

On October 11, 2012, another panel of this court affirmed the district court's denial of Defendants' request to vacate the *NEOCH* Decree and the grant of the *SEIU Local 1* preliminary injunction requiring Defendants to count provisional ballots cast in the correct-location/wrong-precinct due to poll worker error. *See id.*at 584. This court reversed the *SEIU Local 1* ballot affirmation injunction. *See id.*

#### 1. *SEIU Local 1* Preliminary Injunction

In *SEIU Local 1*, this court affirmed the wrong-precinct provision of the preliminary injunction, holding that automatic disqualification of wrong-precinct/right-location most likely violated equal protection and substantive due process. *Id.* at 591-99. We "agree[d] on all counts" with the district court's identification of "three strands of likely constitutional violations related to the wrong-precinct ballots": "the unreasonableness and fundamental unfairness of disqualifying wrong-precinct ballots caused by poll-worker error (equal protection and due process), and the disparate treatment of deficient provisional ballots under the consent decree (equal protection)." *Id.* at 591.

First, we agreed that the *Anderson-Burdick* standard applied because the *SEIU Local 1* Plaintiffs had demonstrated that their right to vote was burdened by Ohio's automatic disqualification rule for all wrong-precinct voters in violation of equal protection. We explained:

> Here, the district court identified a substantial burden on provisional voters. The court's factual findings detail Ohio's "systemic" disqualification of thousands of wrong-precinct provisional ballots and a strong likelihood that the majority of these miscast votes result from poll-worker error. . . .

> Though the district court did not make specific factual findings regarding the incidence of poll-worker error, it found such error evident in poll workers' statutory duty to direct voters to the correct polling place. *See* O.R.C. § 3505.181(C)(1). . . . The court also cited the proliferation of multi-precinct polling locations in Ohio's counties as increasing the likelihood of poll-worker error causing right-place/wrong-precinct ballots. (*See* Plenary Op. & Order at 6 n.10 (finding, as of the 2012 primaries, shared-polling place rates for the following counties' election precincts: Butler, 95%; Cuyahoga, 94%; Greene, 100%; Franklin County, 68%; Lorain, 90%; Montgomery, 88%; Stark County, 71%).)
>
> In addition to these findings, the SEIU plaintiffs presented voluminous evidence that poll workers give voters wrong-precinct ballots for a number of reasons, ranging from misunderstanding counties' precinct location guides to failing to understand the vote-disqualifying ramifications of handing out wrong-precinct ballots.

*Id.* at 593-94.

By contrast, Defendants failed to present evidence to the district court or this court demonstrating that other factors besides poll-worker error caused wrong-precinct ballots. *Id.* at 594. "Given this record and the clear legal duty imposed on poll workers by Ohio law," we found "no clear error with the district court's factual conclusion that most right-place/wrong-precinct ballots result, and will continue to result, from poll-worker error." *Id.* at 594-95. We also held that although the *Sandusky* factors reflected the state's legitimate interests in maintaining a precinct-based system, the State failed to show how these interests supported the restriction at issue. *Id.* at 595-97.

Next, we held that the voter burden identified by the *SEIU Local 1* Plaintiffs also supported the district court's finding of a probable due process violation. *Id.* at 597. We observed that "[t]he SEIU plaintiffs have shown, and the State does not deny, that poll-worker error causes thousands of qualified voters to cast wrong-precinct ballots from the correct polling locations." *Id.* Accepting Defendants' argument that a due process violation requires intentional conduct, we nonetheless found

> sufficient indicia of purposeful conduct in the State's intent to enforce its strict disqualification rules without exception, despite the systemic poll-worker error identified in this litigation and others. *Hunter* shed light on this problem last year,

but the State persisted in its position.  In light of the well-documented problem of
wrong-precinct provisional ballots caused by poll-worker error, resulting in the
rejection of thousands of provisional ballots each year, we have no basis on which
to disagree with the district court's finding of a likely due process violation.

*Id.* at 597-98.

Third, we agreed with the parties and the district court that, by providing a remedy only
for SSN-4 voters, the Decree "likely violate[d] the equal protection principle recognized in *Bush
v. Gore*, [531 U.S. 98 (2000)]."  *Id.* at 598.  We held that the *SEIU Local 1* Plaintiffs' equal
protection claim "squarely raises the statewide disparity inherent in the terms of the consent
decree: its preferential treatment of SSN–4 provisional ballots."  *Id.*  Thus, consistent with
*Hunter*, we affirmed the district court's finding that the Decree's different treatment of similarly
situated provisional ballots likely violated equal protection.  *Id.*  We further held that the
injunctive relief was narrowly tailored to the harm identified: denial of the fundamental right to
vote based on the automatic disqualification of right-place/wrong-precinct votes based on poll-
worker error.  *Id.* at 599.

On the other hand, this court rejected the district court's finding of a likely equal
protection violation based solely on the unreasonableness of disqualifying deficient-affirmation
ballots caused by poll-worker error, "[b]ecause the spotty record and Ohio law" did not support
the district court's presumption of poll-worker error.  *Id*.  Furthermore, the ballot affirmation
deficiencies stemmed from "voters' failure to follow the form's rather simple instructions."  *Id*.
Thus, because the *SEIU Local 1* Plaintiffs had not shown a likelihood of success on the merits of
the deficient-affirmation claim, we reversed the preliminary injunction remedy on this point.  *Id.*
at 600.

### 2. *NEOCH* Decree

In *NEOCH*, this court held that Rule 60(b) applied to Defendants' request to vacate the
Decree and that Defendants had not met their burden under that rule.  *Id*. at 600-03.  Defendants
argued that Rule 60(b) did not apply because the Decree violated Ohio law and was therefore
void under Rule 60(b).  We rejected this argument because Defendants did not allege or show a

"jurisdictional error" or "a violation of due process" that would justify relief under Rule 60(b)(4). *Id.* at 601. We also rejected Defendants' argument that the provision allowing the parties to modify the agreement "for good cause shown" waived the strictures of Rule 60(b). We noted that, although a consent decree is somewhat contractual in nature, it is still subject to Rule 60(b) because it is nonetheless a judicial decree. *Id.* The term "good cause shown" did not change that fact. *Id.* at 601-02. This court also rejected Defendants' position that the Decree was not a final judgment given the Decree's explicit statement that is "final and binding" as to the "matters resolved in this Decree." *Id.* at 602.

Having decided Rule 60(b) applied, we held that Defendants did not meet the requirements of Rule 60(b)(5) because they failed to demonstrate a significant change in circumstances making the Decree unworkable or detrimental to the public interest. *Id.* at 603. Finally we noted that, because the court had set aside the portion of the preliminary injunction addressing deficient-affirmation provisional ballots, and the Decree continued to mandate that some deficient-affirmation provisional ballots be counted, a potential equal protection problem existed under *Bush v. Gore*. *Id*. at 603-04. Furthermore, the Decree "standing on its own" also raised *Bush v. Gore* issues in treating some provisional ballots differently than others. *Id*. at 604. This concern was "not purely academic," because the Decree was "the only agreement governing these issues for Ohio's 2013 primary elections." *Id*. We therefore remanded for the district court to consider in the first instance whether the Decree should be modified to address the discrepancy created by the Decree between different sets of provisional ballots. *Id*.

### 3. Remand

On remand, Plaintiffs obtained a separate preliminary injunction requiring Ohio to count wrong-location/wrong-precinct provisional ballots that resulted from poll-worker error, but this court issued an emergency stay pending appeal of the order. *Serv. Emps. Int'l Union Local 1 v. Husted*, 698 F.3d 341, 343 (6th Cir. 2012) [hereinafter *SEIU Local 1*] (per curiam). The appeal was later dismissed as moot after the 2012 election. *SEIU Local 1 v. Husted*, 531 F. App'x 755, 755 (6th Cir. 2013). The district court also granted Defendants' motion to vacate the Decree's affirmation provision. Plaintiffs did not appeal that decision.

### F. 2013 Proceedings

On June 10, 2013, some of the *NEOCH* Plaintiffs moved to modify the Decree. The district court ordered expedited briefing. Initially Plaintiffs sought an indefinite extension, and later, in the alternative, sought an extension for two presidential cycles, or eight years. On August 5, 2013, the district court granted the motion, extending the Decree until December 31, 2016, one election cycle. (Aug. 5, 2013 Op.). First, it concluded that when they entered the Decree, the parties did not foresee that the voting rights of SSN-4 voters would still not be guaranteed after the Decree terminated in June 2013. Second, it found an extension until December 31, 2016, was suitably tailored to ensure the counting of valid SSN-4 voters in the next election cycle. The court relied on new record evidence from the 2012 election that established the additional burden placed on boards of elections during presidential elections and the accompanying risk of disenfranchisement of SSN-4 voters. Defendants did not appeal that decision.

On July 1, 2013, the *SEIU Local 1* Plaintiffs filed a motion for a permanent injunction that would require the counting of correct-location/ wrong-precinct ballots based on this court's decision affirming the preliminary injunction, the evidence supporting that injunction, and supplemental evidence regarding the 2012 election. Defendants did not object to converting the preliminary injunction to a summary judgment. On July 9, 2013, the court granted summary judgment and issued a permanent injunction. (July 9, 2013 Op.) Defendants did not appeal.

### G. Attorneys' Fees Motions and Awards

This brings us to the district court decision at issue in the present appeal.[3] As noted, the district court's award and this appeal jointly address fees in the *NEOCH* and *SEIU Local 1* cases.[4]

---

[3]Plaintiffs have already received fees for work prior to the Decree and for negotiating the Decree. *See NEOCH v. Sec. of State of Ohio*, 695 F.3d 563 (6th Cir. 2012).

[4]The district court issued the same opinion in both cases. It is dated September 29, 2014 (Sept. 29, 2014 Op.). They are docketed at Doc. 426 in *NEOCH*, Case No. 2:06-cv-896, and Doc. 140 in *SEIU Local 1*, Case No. 2:12-cv-00562.

### 1. The Attorneys

In the *NEOCH* case, Plaintiffs NEOCH and the Columbus Coalition for the Homeless (CCH) were represented by Dayton and Columbus, Ohio counsel of Porter, Wright, Morris & Arthur, LLP, as well as The Chandra Law Firm LLC, of Cleveland, Ohio. Lead attorneys were Caroline Gentry of Porter Wright and Subodh Chandra of The Chandra Law Firm, along with Sandhya Gupta. The Ohio Democratic Party (ODP) was represented by McTigue, McGinnis & Colombo, LLC, of Columbus, Ohio. Donald McTigue acted as lead counsel and Mark McGinnis as junior counsel. Plaintiff SEIU Local 1199 was represented by Altshuler Berzon LLP, of San Francisco, California, and by Hunter, Carnahan, Shoub, Byard & Harshman, of Columbus, Ohio. Altshuler Berzon billed for nine attorneys. Stephen Berzon acted as lead counsel, while Danielle Leonard and Barbara Chisolm argued the cases. The *NEOCH* Plaintiffs billed 2,357.85 hours, with requested rates ranging from $215/hour to $750/hour. They requested a total of $967,593.25 in fees. The *NEOCH* Plaintiffs also submitted a separate fee motion for the 2013 Decree extension.

In the *SEIU Local 1* case, SEIU Local 1 and the other union plaintiffs were also represented by Altshuler Berzon and Hunter Carnahan. Hunter Carnahan also represented the Ohio Organizing Collaborative (OOC). NEOCH, CCH, and ODP were parties only in the *NEOCH* case, not in *SEIU Local 1*. The *SEIU Local 1* Plaintiffs billed 3,641.13 hours at rates ranging from $300/hour to $750/hour. They requested a total of $1,383,436.75 in fees.

### 2. The Motions

The *NEOCH* Plaintiffs who had moved to extend the Decree through 2016 moved for fees for that work on October 21, 2013. On December 12, 2013, all *SEIU Local 1* and the *NEOCH* Plaintiffs moved for fees in both cases (1) for work performed in 2012 and 2013 defending the Decree, (2) obtaining preliminary and then permanent injunctive relief prohibiting disqualification of wrong-precinct/right-location ballots, and (3) the appeal of those decisions.

Plaintiffs did not seek fees for work performed concerning the wrong-location or deficient-affirmation issues.

### 3. The District Court's Award

On September 29, 2014, the district court issued an order granting Plaintiffs' motions for fees in both cases, but it eliminated some time and reduced some of the requested rates. (Sept. 29, 2014 Op.). The court limited "fees for fees" hours to 3% of the time on the main cases.

### a. Hours

The court found that, with certain exceptions, all of the hours submitted were reasonably expended:

> Both NEOCH and SEIU Plaintiffs have provided the Court with extensive and detailed documentation of their hours, supported by affidavits of counsel related to billing entries, efforts to exclude excessive or redundant hours, and general exercise of billing judgment. The Court finds that Plaintiffs have submitted documentation containing sufficient detail and probative value to enable it to determine that the hours recorded were actually and reasonably expended in this action, with certain exceptions explained below.

*Id.* at 6. The district court specifically stated that it had reviewed the time sheets and declarations of each of the attorneys. *Id.* at 6-7.

> Regarding the 2013 extension of the Decree, the court observed that the

> NEOCH Plaintiffs were required to review and analyze the lengthy record and docket of a seven-year-old case, numerous provisions of the Ohio Revised Code, parallel and related litigation, in addition to substantive legal research, analysis, and strategy. As the Court noted at the time, the legal issues around extending the Decree were complex and unsettled . . . and the briefing scheduled was expedited and required intense engagement by all parties.

*Id*. at 8.

Regarding the 2012 work to defend and modify the Decree, the court initially noted that at least 23 attorneys, as well as paralegals and law clerks, worked on this stage of the litigation. The court found that

> Plaintiffs engaged in multiple avenues of defense in order to protect the Decree, including to enjoin the collateral attack on the decree and move for civil contempt; preparing on an expedited basis to intervene at the Ohio Supreme

Court; defending the Decree against Defendants' motion to vacate; and moving to modify the Decree.

*Id*.

Regarding the SEIU Plaintiffs' work in obtaining preliminary and permanent injunctive relief, the court recognized that

Plaintiffs achieved court orders preventing the disenfranchisement of thousands of Ohio voters in 2012 and thereafter; the work required them to attack novel and complex issues of constitutional law, and required them to collect and analyze thousands of pages of evidence showing Ohio's violations of voters' rights.

*Id.*

The district court rejected Defendants' allegations that the hours expended in "researching, drafting, editing, and consulting are too great," stating "Defendants invoke a phantom specter" because their "conclusory allegations that the award was excessive and . . . counsel employed poor billing judgment" did not establish that the fees were unwarranted. *Id.* at 9 (internal quotation marks and citation omitted). The court added that "Defendants can hardly be heard to complain about the number of hours expended by Plaintiffs, when they themselves engaged in a vigorous opposition to the Decree at nearly every phase of this litigation." *Id*.

The court then addressed Defendants' other objections, including attorneys' fees for the *NEOCH* Plaintiffs' mediation costs, travel, fees for fees, SEIU Plaintiffs' certification motion, the *NEOCH* motion to modify the consent decree, and the *NEOCH* motion for contempt. In each instance the court rejected Defendants' arguments that the hours billed were excessive.

#### b. Rates

In assessing rates, the district court considered the customary rates of Plaintiffs' counsel, fee awards in analogous cases, and other evidence. The average rate awarded was $378/hour. Twenty-one rates were $300/hour or more, ten rates were $425/hour or more, and one attorney was awarded $600/hour. Law clerks received between $125/hour and $150/hour.

### c. Costs and Expenses

The court found that since nearly all of Plaintiffs' hours of attorney work were reasonable, their requested costs were also reasonable and appropriate.

In total, the district court allowed billing for 6,147 hours and awarded $2,227,179.90 in fees and costs.

## III. REASONABLE ATTORNEYS' FEES

Section 1988 gives a court discretion to award "a reasonable attorney's fee" to a prevailing party. 42 U.S.C. § 1988(b). A reasonable attorney fee is calculated by the lodestar method. *See Blum v. Stenson*, 465 U.S. 886, 888 (1984); *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The lodestar is "the number of hours reasonably expended on the litigation multiplied by a reasonably hourly rate." *Hensley*, 461 U.S. at 433.

The award-seeking party should submit evidence of the hours worked and the rates sought. *Id*. If "documentation of hours is inadequate, the district court may reduce the award accordingly." *Id*. In determining hours, a court must "exclude from this initial fee calculation hours that were not 'reasonably expended.'" *Id*. at 434 (quoting S. Rep. No. 94-1011, at 6 (1976)). That is, fee applicants must exercise "billing judgment." *Id*.; *see also id*. at 437. Counsel are expected to "exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Id*. at 434.

## IV. STANDARD OF REVIEW

This court reviews a district court's award of attorney fees and costs for an abuse of discretion. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 551 (6th Cir. 2008). "A district court abuses its discretion when it relies upon clearly erroneous findings of fact, applies the law improperly, or uses an erroneous legal standard." *Id*. (quoting *Wikol v. Birmingham Pub. Schs. Bd. Of Educ.*, 360 F.3d 604, 511 (6th Cir. 2004). Substantial deference "is appropriate in view of

the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley*, 461 U.S. at 437.

But that discretion "is not unlimited." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 558 (2010). "It is essential that the judge provide a reasonably specific explanation for all aspects of a fee determination . . . ." *Id*. In other words, the court must provide "a concise but clear explanation of its reasons for the fee award." *Hensley*, 461 U.S. at 437; *see also Wooldridge v. Marlene Indus. Corp*., 898 F.2d 1169, 1176 (6th Cir. 1990) (remarking that "[a] district court should state with some particularity which of the claimed hours the court is rejecting, which it is accepting, and why"), *abrogated on other grounds by Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res*., 532 U.S. 598 (2001).

## V. APPEAL

### A. Hours Awarded

Defendants contend that the district court abused its discretion by awarding 6000+ hours in the two cases, highlighting eleven areas. We keep three things in mind as we address Defendants' arguments. First, *Hensley* focuses on the bottom line: "the most critical factor is the degree of success obtained." *Hensley*, 461 U.S. at 436. "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Id.* at 435. Second, in assessing fees, district courts are not required to act as "green-eyeshade accountants" and "achieve auditing perfection" but instead must simply to do "rough justice." *Fox v. Vice*, 563 U.S. 826, 838 (2011). This means that the court can rely on estimates based on its "overall sense of a suit." *Id*. Third, because the district court has a superior understanding of the litigation, we must afford "substantial deference" to its factual determinations. *Id*.; *Hensley*, 461 U.S. at 437.

We now examine Defendants' complaints.

### 1. Attendance and Travel Time

Defendants claim that "[a] key feature of counsel's excessive billing is duplicative attendance and travel for court proceedings." Defendants' OB at 23. Defendants argue that

Plaintiffs did not demonstrate the need for so many attorneys, mostly senior attorneys with high rates, who were not arguing, and faults the district court for not explaining why it approved these hours. Defendants also complain that counsel billed excessive travel, particularly out-of-state travel. Defendants offer the following examples in support of their argument. First, they complain that too many attorneys billed for telephone conferences, highlighting numerous occasions when the number of attorneys who billed for a conference exceed the number of attorneys who actually spoke at the conference.[5]

Defendants also complain about the hours billed for attendance at oral arguments. They emphasize the sheer number of hours billed, the discrepancy between the number of attorneys appearing at oral argument and the number of attorneys who actually argued, and the number of attorneys who billed for travel. First, they assert that the hours billed for the June 27, 2012 oral argument, which addressed the Decree's validity and *SEIU Local 1* scheduling, were excessive. Counsel charged for eight attorneys to participate, but only three Plaintiffs' attorneys handled the proceedings: Leonard and Gentry argued the merits, and Chisolm addressed SEIU *Local 1* logistics. They collectively billed 90 hours for argument-related travel, preparation, and attendance for June 26 and 27 and 70 hours on the day of argument. At least four attorneys billed travel. Second, Defendants object to the 100+ hours billed for the July 30, 2012 oral argument concerning the *SEIU Local 1* preliminary injunction motion and *NEOCH* motion to modify. Plaintiffs charged attendance for ten attorneys, even though only Chisolm and Leonard spoke. Between July 29 and 30, ten of these attorneys billed 100+ hours for hearing related activities.[6] Third, Defendants contend that counsel billed excessive hours for the October 1, 2012 telephonic oral argument in this court. Leonard argued. Six attorneys billed for participation, five from Altshuler Berzon. Leonard billed 60 hours of argument preparation from

---

[5]Defendants point out that thirteen attorneys billed for attendance at the May 9, 2012 telephone conference, although only four spoke on behalf of Plaintiffs; eleven attorneys billed for attendance at the follow-up telephone conference the next day, May 10, 2012, although only Gentry and Berzon spoke for Plaintiffs; and seven attorneys billed for the May 16, 2012, scheduling conference, but only Gentry and Berzon spoke.

[6]This included the travel for three Altshuler Berzon attorneys from San Francisco to Columbus and Attorney Donita Judge from New Jersey on behalf of ODP. Defendants highlight Berzon's billing because he did not argue the motions—Leonard did—and she billed 40 hours in preparation from July 25-28. Berzon billed 24.5 hours on July 29-30 for hearing-related time, exclusive of expenses.

September 25 to 30. Berzon also billed 21 hours from September 24 to 30. Fourth, Defendants challenge the hours billed in connection with oral argument in the district court on July 12, 2013, regarding the extension of the Decree. Plaintiffs charged for four attorneys to attend (travel for three) and a total of 80+ argument-related hours.

The district court did not conduct an atomized line-item analysis of the hours allocated to telephone conferences and oral arguments. However, the court found that Plaintiffs had presented "extensive and detailed documentation of their hours," which contained "sufficient detail and probative value to enable" the court to make the factual determinations that "the hours recorded were actually and reasonably expended in this action." Sept. 29, 2014 Op., at 6. It reiterated that "although multiple attorneys worked on these cases," that was "no[t] inherently unreasonable," and that "[t]he time records submitted in these cases" were sufficiently detailed and established proper billing judgment. *Id*. at 8-9. In light of Plaintiffs' extensive documentation, the court found that Defendants' conclusory allegations that fees were unwarranted did not establish that there was error. *Id*. at 9.

Multiple-lawyer litigation is common and not inherently unreasonable. *See, e.g., Gautreaux v. Chicago Hous. Auth.*, 491 F.3d 649, 661 (7th Cir. 2007); *ACLU v. Barnes*, 168 F.3d 423, 432 (11th Cir. 1999); *see also Coulter*, 805 F.2d at 152 (remarking that "multiple representation can be productive," but "there is also the danger of duplication, a waste of resources which is difficult to measure"). At the same time, *Hensley* made clear that in assessing hours "reasonably expended," the district court should evaluate whether the case is "overstaffed." *Hensley*, 461 U.S. at 434. The district court did just that. Its "concise but clear explanation of its reasons for the fee award" is easily supported by the record. *Id.* at 437. Given the extremely expedited pace in the few short months before the 2012 presidential election and complexity of the litigation, the need for multiple attorneys to handle the various legal and factual facets of the two cases is obvious. In early May 2012, the litigation was quickly taking shape, so multiple attorneys' attendance at telephonic conferences ensured that members of the team were fully and efficiently informed. Furthermore, Plaintiffs were represented by different counsel, and those counsel were required by local rule to attend all such proceedings. *See* S.D.

Ohio Civ. R. 83.4(a) ("[I]n all actions filed in . . . this Court, all parties . . . must be represented at all times by a 'trial attorney' . . . . The trial attorney shall attend all hearings, conferences, and the trial itself unless excused by the Court from doing so.").

The same is true for the hearings. Take, for example, the July 30, 2012 hearing on the *SEIU Local 1* preliminary injunction motion and the *NEOCH* motion to modify the Decree. This was a critical hearing, as the district court's Plenary Opinion and Order reflects. Counsel of record—Donita Judge for OOC, Donald McTigue for ODP, Michael Hunter for SEIU 1199 in *NEOCH* and the union plaintiffs in *SEIU Local 1* as well as Subodh Chandra and Caroline Gentry for NEOCH—, were required to be present. In addition to client representation, other attorneys present at the hearing made specific contributions to the issues to be presented: Leonard conducted substantive legal work in both cases; Chisolm conducted substantive work in *SEIU Local 1*; Berzon provided substantive and strategic guidance; Chandra, Gentry, and McTigue had knowledge of the *NEOCH* case history and substantive work on the pending motions; and Miller and Harshman performed work on the evidence presented in both cases. Given the importance of this hearing, complexity of the issues, and the number of parties involved in the two cases, the number of counsel present does not seem unreasonable. In any event, the district court was there and in a far better spot to assess whether the number of counsel was necessary.

Moreover, in the face of Plaintiffs' very detailed billing records "'conclusory allegations that the award was excessive and that . . . counsel employed poor billing judgment . . . do not suffice to establish that there was error . . . , particularly in light of the statements of the district court [explaining the award] and our standard of review.'" *Imwalle*, 515 F.3d at 553 (quoting *Perotti v. Seiter*, 935 F.2d 761, 764 (6th Cir. 1991)). As the district court found, Plaintiffs presented detailed billing records as well as Declarations explaining the nature of the work performed. Like the records in *Imwalle*, the itemized billing records for each entry specify the date that the time was billed, the individual billing the time, and a brief explanation of the specific task completed. *See id.* at 553. Plaintiffs' counsel was "not required to record in great detail how each minute of his time was expended," as long as the general subject matter was

identified. *Hensley*, 461 U.S. at 437 n.12.**7** When read in conjunction with the timeline of the litigation, the billing records support the district court's determination that the hours charged were reasonably expended. *See Imwalle*, 515 F.3d at 554.

The district court's ruling that Plaintiffs' requested fees for travel to and from the court for various oral arguments was therefore proper. *See, e.g.*, *Wayne v. Vill. of Sebring*, 36 F.3d 517, 532 (6th Cir. 1994) (holding that travel time is fully compensable); *Perotti*, 935 F.2d at 764 (noting that "matters of this sort are within the discretion given the district court").

### 2. Conferencing

Defendants complain that counsel spent unreasonable time conferencing with one another. First, Defendants note that 1,190 entries—659 in *SEIU*, 531 in *NEOCH*—include some form of internal conference. Defendants claim that routine block billing makes it impossible to tell how much time is billed just for conferencing, but even a conservative estimate suggest 650+ conferencing hours (300 in *NEOCH*, 370 in *SEIU Local 1*). This amounts to more than a tenth of the awarded hours.

"There is no hard-and-fast rule as to how many lawyers can be at a meeting or how many hours lawyers can spend discussing a project." *Gautreaux*, 491 F.3d at 661. As this court remarked in *Coulter*, "[h]ours spent in reviewing records, talking to other lawyers or experts,

---

**7**Defendants' complaints about block billing are unfounded. This court has held block billing "can be sufficient" if the description of the work performed is adequate. *Smith v. Serv. Master Corp.*, 592 F. App'x 363, 371 (6th Cir. 2014); *see also Pittsburgh & Conneaut Dock Co. v. Dir., Office of Workers' Comp. Programs*, 473 F.3d 253, 273 (6th Cir. 2007) (Moore, J., concurring in part and dissenting in part) ("[Plaintiff] has cited no authority to support its argument that the use of block billing is contrary to the award of a reasonable attorney fee . . . and, in fact, our sister circuits have rejected block-billing objections to fee awards in a number of contexts.").

Defendants choose the following block-bill by Gupta in connection with the July 9, 2013 extension of the Decree. Chandra argued the motion.

> Review deposition transcripts of counties and tabulate into chart; prep co-counsel S. Chandra for tomorrow's oral argument; elaborate on case summaries of termination cases for S. Chandra review; prepare B. Davis declaration and confer with B. Davis re charges; prepare exhibits to declaration and notice of filing; review outline and other potential questions for oral argument.

NEOCH, ID# 13744.

We find the description of the work performed by Gupta in helping Chandra prepare for oral argument to be more than adequate in the context of this litigation.

preparing legal documents and the like cannot be fully verified and require the court to trust the lawyer's word that the hours claimed represent necessary work actually performed." *Coulter*, 805 F.2d at 150. Here, counsel provided detailed billing records and submitted declarations stating that these discussions also permitted senior lawyers to provide important strategic guidance to more junior lawyers, without duplicating efforts, thereby increasing efficiency. The district court rejected Defendants' argument that counsel spent too much time "consulting," crediting the lawyers' accounts of their time based on the court's intimate understanding of the complexity of the proceedings before it. Sept. 29, 2014 Op., at 9. "[I]t is not this court's job to second-guess that judgment." *Gautreaux*, 491 F.3d at 661. Again, given Plaintiffs' detailed documentation, and the district court's explanation of the award, Defendants' conclusory "too many hours" allegations do not establish error.

### 3. Legal Research

Next, Defendants argue that counsel billed unreasonable and duplicative research hours. In total, the *NEOCH/SEIU Local 1* legal teams billed roughly 750 hours on research activities. This included: fifteen *NEOCH* attorneys who billed their own research; eight *SEIU Local 1* attorneys who billed their own research; Altshuler Berzon Attorney Diana Reddy's 20+ hours researching "expansion of consent decree"; Reddy's 30+ hours researching civil contempt; and law clerk research on numerous subjects by the Altshuler Berzon firm (9.8 hours researching constitutional issues, 8 hours researching unlitigated HAVA claims, 9.4 hours researching "1983 injunction," 7.8 hours researching "deliberate indifference," and 11.8 hours for an evidentiary standards memo).

The district court disagreed, citing not only Plaintiffs' detailed billing records and Defendants' conclusory allegations that the award was excessive, but also that Defendants had mounted a vigorous opposition to the Decree and were therefore in no position to complain. Sept. 29, 2014 Op., at 9. Further, the court expressly stated that the 2013 extension required Plaintiffs to engage in "significant substantive legal research, analysis, and strategy"; that the 2012 work involved "multiple avenues of defense in order to protect the Decree"; and that the

preliminary and permanent injunction motions required Plaintiffs "to attack novel and complex issues of constitutional law." *Id.* at 8.

Defendants retort that generic allusions to "complexity" and "novel and complex issues of constitutional law" should not provide a free pass for scrutiny of the hours here. But the district court specifically held that this case involved "significant novel and complex constitutional and procedural issues, including the All Writs Act, the Anti-Injunction Act, the applicability of Fed. R. Civ. P. 60(b), and the constitutionality of state laws and practices under the Equal Protection and Due Process Clauses." *Id.* at 29. We do not read the district court's "concise but clear explanation" in a vacuum, but against the backdrop of the comprehensive written opinions of the district court and this court, which fully establish the complexity of the numerous federal and procedural issues presented in these cases. Again, other than complaining about the numbers, Defendants offer no explanation *why* the hours are excessive. Such conclusory allegations do not provide us with any basis to discredit the district court's factual findings.

### 4. Drafting and Editing Filings

Defendants point out that the *SEIU Local 1* team, which included six attorneys, charged 300 hours for drafting and editing the complaint and preliminary injunction motion,[8] and an additional 130 hours, involving six attorneys, for drafting and editing their twenty-page reply. Similarly, the *NEOCH* Plaintiffs charged 150 hours, from eleven attorneys, to draft the motion to enjoin.

Defendants note that the *NEOCH* team billed 190 hours, from thirteen different attorneys, drafting, editing, or reviewing the May 30 brief regarding the Decree's validity. The *NEOCH* Plaintiffs also billed 215 hours between August 21 and September 4 for appellate brief work that included work from ten different attorneys. The *SEIU Local 1* Plaintiffs submitted 375+ hours from six attorneys for the *SEIU Local 1* appellate brief.

---

[8]Leonard herself billed 120+ hours from June 7 to 21 on the preliminary injunction motion. Five other attorneys billed for drafting and editing that motion. Reddy and Leyton billed a combined 22.1 hours described as "Research and draft substantive due process argument."

Defendants also point to "excessive" time on minor filings, such as at least 8 hours to provide notice to the district court that *SEIU Local 1* was related to *NEOCH/Hunter* litigation. Also *SEIU Local 1* counsel billed 13 hours (four attorneys) for a case-related letter to this court.

Defendants maintain that the foregoing litany establishes that counsel spent unreasonable hours on their motions and briefing, which often involved the same or similar issues. Defendants claim abuse of discretion by the district court because its analysis was minimal—namely, that it did not address the actual hours billed for drafting and editing, did not analyze any specific billing entries, and offered merely "a brief, oversimplified mention of the State's positions."

However, other than aggregating the time spent on specific filings, Defendants offer no explanation *why* the hours were excessive. Thus, as the district court held, Defendants failed to meet their burden of establishing error in light of Plaintiffs' detailed records and the district court's findings. *See Imwalle*, 515 F.3d at 553. Granted, numerous hours by more than several attorneys were billed for drafting and editing motions and briefs. But those submissions, prepared under extreme time pressure, helped the district court resolve the issues in this case in Plaintiffs' favor.

The district court's overall assessment of hours reasonably expended was based on its unique understanding and reliance on Plaintiffs' research and advocacy. As we observed in *Coulter*, "[w]hen the issue is a question of the lawyer's judgment in billing for a particular number of hours on a piece of work, we must depend in larger measure on the fairness of the District Court in assessing the needs of the case." *Coulter*, 805 F.2d at 152. To put it bluntly, the district court assessed that Plaintiffs' substantial success was due to the skill and substantial efforts of counsel, and its expressly said so. That decision deserves substantial deference.

### 5. Unfiled Proposal

Defendants also assert that counsel unnecessarily increased hours by preparing a memo addressing proposed findings of fact and conclusions of law in advance of the hearing on Plaintiffs' statewide preliminary injunction, which the district court did not request and did not use. At the hearing the district court praised "the extensive briefing" in the case, stating that it

put the court "in an excellent position to decide this PI [preliminary injunction] based on the papers that have been filed and the arguments that have been made," but it expressed concern that the Plaintiffs' proposed filing would "prolong the process" because Defendants might want to file a response. *NEOCH*, 2:06-cv-896, ID# 12353-54.

The district court did not isolate the hours spent on the unfiled proposal in its opinion awarding fees. Instead, it made an overall assessment. "[W]e look to see whether the District Court, based on experience and the record in the case, misapplied the reasonable billing practices of the profession." *Coulter*, 805 F.2d at 151. Because work on the proposal was of a sort that "a reasonable attorney would have believed . . . to be reasonably expended in pursuit of success at the point in time when the work was performed," *Wooldridge*, 898 F.2d at 1177, it cannot be said that counsel exercised poor billing judgment. We find no abuse of discretion in allowing compensation for such hours.[9]

### 6. Discovery

Defendants claim that Plaintiffs also billed excessive hours for gathering evidence and preparing evidentiary declarations and attachments. Initially they note that it is impossible to calculate an exact discovery total because of block billing, but the State estimates 1300+ hours for coordinating discovery, organizing evidence, and filing declarations/exhibits. Defendants also fault Plaintiffs for conducting discovery on all 88 Boards of Elections rather than a sample of counties.

Defendants isolate 30 hours charged by staff from May 24 to 25 for travel to counties to pick up and inspect documents. Attorney Jared Klaus of Porter Wright submitted numerous entries referencing clerical tasks such as cataloguing emails and compiling records. On June 13-14, 2012, he billed 15+ hours for "creating spreadsheet showing the status of public record

---

[9]Defendants also claim that the *NEOCH* Plaintiffs billed more than 40 hours preparing an "unwarranted" reply brief on May 10. On May 9, the district court had asked the Relators to prepare a response to Plaintiffs' motion to enjoin to be provided by the end of the next day. The court did not ask for a reply brief, but *NEOCH* counsel filed one anyway, thirty minutes prior to the court's oral decision on May 10. Work performed on the reply brief was properly billed because a reasonable attorney would have believed that a reply was necessary at the point in time when the reply brief was prepared. *See Wooldridge*, 898 F.2d at 1177.

requests to each county." Defendants also point out that more senior attorneys billed for extensive discovery. Attorney Cathrine Harshman of Hunter Carnahan block billed 12 hours for "Preparation of subpoenas; request for production" on June 29. Attorney Michael Hunter of Hunter Carnahan "block billed" another six hours the same day with an identical billing description. Between July 2 and 11, Harshman reported 60 hours of document review and conferencing with Election Boards.

The district court found that in securing the preliminary injunction, and ultimately the permanent injunction, Plaintiffs were required "to collect and analyze thousands of pages of evidence showing Ohio's violations of voters' rights." Sept. 29, 2014 Op., at 8. The record easily supports the district court's findings. As Leonard explained in her Reply Declaration in support of Plaintiffs' Motions for Attorneys Fees, the amount of material received from the Ohio County Boards and the Ohio Secretary of State was enormous, and not organized by subject matter or relevance to the provisional ballot issues raised by the litigation. Counsel reviewed and analyzed documents ranging from (1) minutes and transcripts from four years of County Board of Election meetings where provisional ballots were discussed; (2) the Secretary of State's statistics on provisional ballots for four years of elections; (3) maps and diagrams of polling locations; (4) training materials and Directives from the state and county boards with respect to elections; (5) voter complaints and other incident logs from four years of elections; (6) county address and street guides used by poll workers in the 2012 elections; and (7) records showing the number and location of multi-precinct polling place locations. *SEIU Local 1*, No. 2:12-cv-562, ID # 7333. This information had to be gathered in a very short period of time for incorporation into the motion for a preliminary injunction. For this reason it is not surprising that several attorneys, including senior attorneys, participated in the process of gathering and analyzing these materials.

Furthermore, as recited above, in its Plenary Opinion and Order, the district court relied heavily on the gathered evidence in finding that the problem of disqualifying wrong-precinct ballots due to poll-worker error was "systemic and statewide." Aug. 27, 2012 Op. at 26. This court's opinion affirming the district court cited extensively to the volume of evidence.

*See NEOCH*, 696 F.3d at 586.   Indeed, the discovery supported the requested relief in these cases.  As the district court recognized, the *SEIU Local 1* lawsuit presented "'the hypothetical statewide challenge' foreseen by the *Hunter I* Court."   Aug. 27, 2012 Op. at 18; *see also NEOCH*, 696 F.3d at 593 n.7 ("These findings regarding the statewide disqualification of wrong-precinct ballots amplify the countywide evidence established in *Hunter*.").   Offering a small sample of county boards might have allowed Defendants to argue that the evidence was insufficient to warrant statewide pre-election injunctive relief.

Defendants' complaint about Klaus's hours is unwarranted.  As the *NEOCH* Plaintiffs' explain, Klaus's billing entries established that he "field[ed] calls from Board of Election officials responding to public record requests," *NEOCH*, 2:06-cv-896, ID# 13963-64, conducted legal research on public-record requests, and drafted correspondence to non-responsive boards. Klaus was a first-year associate at the time, and it was not unreasonable to have him compile and coordinate the public record requests.

Next, Defendants point to the number of declarations filed.  The *NEOCH* Plaintiffs submitted 17 declarations (8 reply declarations) with their motion to modify.  The *SEIU Local 1* Plaintiffs also filed numerous declarations, reply declarations, and supplemental reply declarations in connection with their preliminary injunction motion.[10]

Defendants' utterly conclusory allegations defeat serious consideration of this claim. *See Imwalle,* 515 F.3d at 553.  The district court reviewed these declarations and found, as part of its overall assessment of the hours expended, that the requested hours were reasonable. Again, based on the district court's direct experience, the record itself, and the absence of any explanation from Defendants, we find no abuse of discretion.

---

[10]According to Defendants, in *SEIU Local 1*, seven attorneys from Altshuler Berzon billed for drafting, editing, and/or reviewing declarations.  From June 13 to 17, Reddy billed 44.3 hours for reviewing documents and drafting declarations.   During the same period, Cincotta spent 25 hours reviewing documents and drafting declarations.   From June 18 to 22 Harshman billed 34 hours for primarily preparing exhibits and declarations, including 14.5 hours on June 22 for "Preparation of exhibits for filing; electronic filing of complaint and PI motion and exhibits; service copies."

**7. Consent Decree Extension**

Defendants complain that counsel billed excessive time, 335 hours, for obtaining the 2013 Decree extension, despite the narrow issue. This included 150 hours preparing the motion to extend; 65 hours preparing a reply brief; and 80 hours for argument preparation, attendance, and travel. Defendants claim that this time for the extension (which was not appealed) was unreasonable because counsel was already familiar with *NEOCH*.

The district court specifically found that the hours expended in obtaining the Decree extension were reasonable because the case had a lengthy record, it involved numerous provisions of the Ohio Revised Code and parallel state and federal litigation, the legal issues were "complex and unsettled," and the briefing scheduled was expedited. Moreover, it found that, based on new record evidence from the 2012 election, an extension through the next presidential cycle was necessary to prevent the disenfranchisement of SSN-4 voters. Again, Defendants' conclusory allegations of "too much time," in light of the district court's "concise but clear explanation" based on its substantial experience with these proceedings, cannot establish error.

**8. Post-Appeal Activities**

Defendants claim that *SEIU Local 1* attorneys spent an unreasonable amount of time, 190 hours, on post-appeal activities, including obtaining unopposed relief. First, Defendants fault the *SEIU Local 1* Plaintiffs for filing a 35-page motion, eight additional exhibits, a proposed order, and a separate motion seeking expedited consideration of the permanent injunction since they had already prevailed. The drafting was delegated to Laura Trice of Altshuler Berzon, who had no *SEIU Local 1* experience. Additionally, attorneys charged 50 hours for assorted activities, including drafting and editing a "strategy memo" and reviewing the *NEOCH* litigation. Plaintiffs billed 100 hours (seven attorneys) in relation to the permanent injunction filings.

The district court expressly rejected Defendants' challenge to the amount of time (including the use of a new attorney) spent on the permanent injunction motion: "The Court is

satisfied that Plaintiffs' work in seeking a permanent injunction, and providing the Court with the factual and legal basis to enter its Order, was of the sort that a reasonable attorney would have believed to be reasonably expended in pursuit of success" when the work was performed. Sept. 29, 2014 Op., at 15 (internal quotation marks, edits and citation omitted). Again, the district court provided a "concise but clear explanation" that is entitled to substantial deference by this court. As Plaintiffs argued in the district court, no competent counsel would ask the district court to rubber stamp a conversion of a preliminary injunction into a permanent injunction without providing legal and factual support.

Defendants also assert that the only 2013 work within the scope of the *SEIU Local 1* fee motion was obtaining a correct-place/wrong-precinct permanent injunction, but that counsel for the *SEIU Local 1* Plaintiffs billed 30 hours for the 2013 mediation, with entries from seven attorneys, despite the fact that the mediation focused on other issues. The district court reviewed the time records and found that the fees related to mediation (as to the *NEOCH* Plaintiffs) were proper because in the months prior to June 30, 2013, the parties engaged in settlement discussions without reaching an agreement, and the *NEOCH* Plaintiffs decided to move for an extension of the Decree as the expiration date approached. Sept. 29, 2014 Op., at 10-11. As to the *SEIU Local* 1 Plaintiffs, Defendants have not provided any evidence to support their claim that the time included issues other than those upon which Plaintiffs prevailed. In the context of the overwhelming success Plaintiffs achieved, the district court did not abuse its discretion for failing to trim hours devoted to a process that moved the entire litigation along.

### 9. Contempt request

Approximately 130 hours (from ten attorneys) of the 532 hours spent on the motion to enjoin phase reference contempt. The district court denied the request to hold the Relators in contempt, instead giving the Relators a chance to comply with the injunction. Defendants therefore claimed that Plaintiffs' request for contempt was premature. However, the district court agreed with Plaintiffs that seeking to hold the Relators in contempt was a reasonable alternative strategy, given the Relators' "extraordinary actions in attempting to circumvent" the Decree, the short time frame, and Ohio Supreme Court proceeding. Sept. 29, 2014 Op., at 17-18.

Again, the district court's factual determination is entitled to substantial deference, for good reason, because the district court was in the trenches of this litigation. Even if we thought the amounts were high, "the call was not initially delegated to us, and that makes all the difference." *Ohio ex rel. Skaggs v. Brunner*, 629 F.3d 527, 532 (6th Cir. 2010).

### 10. Attempted Class Certification

Counsel billed 115 hours for their attempt to certify a defendant class of all members of Ohio's 88 Boards of Elections. Defendants assert that the time was unnecessary, because the *SEIU Local* 1 Plaintiffs voluntarily withdrew their certification attempt after the district court ruled that the Secretary has direct authority over Board members. *See, e.g.*, Ohio Rev. Code § 3501.05(B). The district court held that although the motion was ultimately moot, given its conclusion that the county boards of elections are agents of the Secretary, Plaintiffs were not unreasonable in seeking to certify the class because one month earlier, in *NEOCH*, "the State legislators had argued that they were not bound by the Decree, and so could not be enjoined to comply with it." Sept. 29, 2014 Op., at 16.

Defendants claim that the district court's holding rests on a confusing comparison of the county board members to the Relators who brought the Supreme Court mandamus action. However, as the district court explained, it was not unreasonable for Plaintiffs to seek a remedy that would apply statewide, given the Relators' attempt the previous month to circumvent the Decree. Again, such work was of a sort that a reasonable attorney would have believed at the time was necessary to success. *See Wooldridge*, 898 F.2d at 1177.

### 11. *NEOCH* Motion to Modify Decree

Lastly, Defendants complain that counsel should not have billed any hours, much less more than 300 hours, for the *NEOCH* motion to modify, which they claim was subsumed by the broader motion for preliminary injunction in *SEIU Local 1*. They point out that the *NEOCH* Plaintiffs filed their motion to modify on June 20, seeking to modify the Decree. The motion applied only to SSN-4 voters and was based on ongoing equal protection and substantive due process violations. Two days later, *SEIU Local 1* Plaintiffs, represented by essentially the same

attorneys—ten of the twelve *SEIU Local 1* attorneys were also *NEOCH* attorneys—filed a separate motion for a preliminary injunction. The *SEIU Local 1* motion also rested on equal protection and substantive due process challenges to provisional ballot practices and sought the same injunctive relief.

The district court recognized that the relief sought was overlapping, stating in its Plenary Opinion and Order that "the requested relief in the Motion to Modify is encompassed within the Plaintiffs' proposed injunction in the Motion for Preliminary Injunction" and "the basis for relief in the Motion to Modify depends on the determination of the constitutional violations at issue in the *SEIU* case." Aug. 27, 2012 Op., at 1. The *NEOCH* Plaintiffs admitted that the motions sought the same injunctive relief and requested that "these motions be heard together, so that the constitutionality or unconstitutionality of Ohio's provisional ballot system may be adjudicated prior to the upcoming election." Motion to Modify, NEOCH, 2:06-CV-896, at 5; ID# 6910.

The district court found that the time spent pursuing a motion to modify the *NEOCH* Decree was reasonable, accepting Plaintiffs' argument that the motion "was undertaken to prevent constitutional violations in the November 2012 implementation of the Decree that would have rendered it vulnerable to post-election attack and vacatur." Sept. 29, 2014 Op., at 16-17 (internal quotations and citation omitted). Furthermore, the motion was not denied; the court's ultimate order granted the same equitable relief requested by the motion to modify. Thus, the court found that the *NEOCH* Plaintiffs' work was reasonably undertaken at the time performed. *Id.* at 17.

The district court did not abuse its discretion. Modification of the Decree would have extended through 2013, whereas the *SEIU Local 1* injunction only covered the November 2012 election. The motion to modify the Decree and the motion for a preliminary injunction arose in different cases, by different parties, in different procedural contexts. Furthermore, the *NEOCH* motion to modify involved distinct legal arguments regarding Rule 60, which was not at issue in the *SEIU Local 1* preliminary injunction. As the district court noted, had Plaintiffs not moved for modification, the Decree would have been vulnerable to constitutional attack, since it provided protection for SSN-4 voters who cast wrong-precinct ballots due to poll-worker error

but not for others.  Thus, that counsel sought overlapping relief for the 2012 election on behalf of their separate clients did not render the work in *NEOCH* unreasonable.

### 12. Recap

Although Defendants vigorously and repeatedly tell us that requested hours are unreasonable, they never tell us how and why the hours were excessive except to say that they are "too high."  Other than aggregating numbers, Defendants have utterly failed to establish that the requested hours were unnecessary in the context of the litigation before the district court and this court and that counsel exercised poor billing judgment.[11]  In light of Plaintiffs' detailed billing records and declarations, which provide a comprehensive picture of how the hours were spent, and the district court's "concise but clear explanations," Defendants have failed to show that the district court abused its discretion in awarding the requested hours.

As detailed above, the record speaks for Plaintiffs.  As the district court observed, "Plaintiffs' victory in this case was . . . a substantial victory in a hugely complex case involving unsettled areas of both constitutional and procedural law."  Sept. 29, 2014 Op. at 26.  In the course of just over six months, the *NEOCH* Plaintiffs defeated an effort to render the federal Decree void through state Supreme Court original proceedings; assembled "voluminous evidence" of poll-worker error causing voter disenfranchisement; defended the Decree against vacatur on appeal, including prevailing on both the Rule 60 standard and application of that standard to the Decree; and then, along with *SEIU Local 1* Plaintiffs, obtained, and successfully defended on appeal, a major voting rights opinion from this court, a statewide injunction requiring state officials to count tens of thousands of ballots that would otherwise have been rejected in the then-imminent general election.  That injunction was later converted to a permanent injunction.  The *SEIU Local 1* case involved complex and novel issues of equal protection and due process in the context of election administration.  The *Bush v. Gore* equal

---

[11]We find it curious, or perhaps not so, that Defendants did not attempt to establish unreasonableness by contrasting Plaintiffs' hours with the time expended by their attorneys.  In essence, Defendants are asking this court to cull through the records and conduct an atomized line-item review.  But as stated throughout this opinion, the Supreme Court does not require district courts to conduct such an analysis and precludes us from micromanaging fee awards.

protection issues raised by the Decree itself were unprecedented and complex. Finally, the *NEOCH* Plaintiffs obtained an extension of the Decree through the end of the next Presidential cycle, until December 31, 2016. The district court not only had a front-row seat during these proceedings, but it actively participated by resolving the complex issues in this case in comprehensive written opinions produced on an expedited basis, with the aid of substantial expertise and effort from Plaintiffs' counsel in the face of vigorous opposition by Defendants. The district court's 31-page opinion explained the bases for its fee award as to the hours reasonably expended. That decision is entitled to substantial deference. We find no abuse of discretion.

Given this conclusion, we need not address Defendants' request for an across-the-board reduction.

## B. Rates Awarded

Defendants contend that the district court "awarded rates too high to too many lawyers." Defendants' OB at 15. The following chart displays the rate requested by each attorney and the rate awarded by the district court:

| Firm | Attorney | Rate ($ hr) | Rate awarded |
|------|----------|-------------|--------------|
| Altshuler Berzon LLP | Stephen P. Berzon | 750 | 600 |
|  | Jonathan Weissglass | 615 | 550 |
|  | Stacey M. Leyton | 565 | 475 |
|  | Danielle E. Leonard | 490 | 450 |
|  | Peder Thoreen | 490 | 450 |
|  | Barbara J. Chisholm | 490 | 450 |
|  | Caroline Cincotta | 355 | 320 |

|  | Diana Reddy | 340 | 305 |
|---|---|---|---|
|  | Matthew Murray | 320 | 290 |
|  | Laura Trice |  | 240 |
|  | Law Clerks | 215 | 150 |

| Chandra Law Firm | Subodh Chandra | 435 | 425 |
|---|---|---|---|
|  | Ashlie Case Sletvold | 350 | 350 |
|  | Sandhya Gupta | 300 | 300 |
|  | Paralegals | 120 | 120 |

| McTigue & McGinnis | Donald McTigue | 550 | 450 |
|---|---|---|---|
|  | J. Corey Colombo | 360 | 360 |
|  | Mark A. McGinnis | 360 | 360 |

| Porter, Wright, Morris & Arthur | Kathleen Trafford | 445 | 445 |
|---|---|---|---|
|  | Caroline Gentry | 350 | 350 |
|  | L. Bradfield Hughes | 335 | 335 |
|  | Eric Gallon | 335 | 335 |
|  | Daniel Miller | 275 | 275 |

| | Jared Klaus | 215 | 215 |
|---|---|---|---|
| | Law Clerks | 125 | 125 |
| | Paralegals, support | 125 | 125 |

| Hunter, Carnahan, Shoub, Byard & Harshman | Michael J. Hunter | 450 | 450 |
|---|---|---|---|
| | Cathrine Harshman | 300 | 300 |

| Advancement Project | Donita Judge | 375 | 375 |
|---|---|---|---|

Defendants contend that the following rates are unreasonable—twenty-one rates of $300/hour or more, ten rates of $425/hour or more, and one $600 rate. Defendants argue that the awarded rates exceed what was necessary to attract capable counsel in Southern Ohio. In support they point to the rates awarded in other Ohio election law cases, an Ohio bar survey, and the rates of Plaintiffs' own in-state counsel in the current award.

The district court has broad discretion in determining a reasonable hourly rate for an attorney. *Wayne*, 36 F.3d at 533. To determine a reasonable hourly rate, courts use as a guideline the prevailing market rate, which is defined as "the rate that lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record." *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004); *see also Blum*, 465 U.S. at 895 (stating that "[t]he statute and legislative history establish that 'reasonable fees' under § 1988 are to be calculated according to the prevailing market rates in the relevant community"). Thus, the appropriate rate is not necessarily the exact rate of a particular firm, but the market rate in the venue sufficient to encourage competent lawyers in the relevant community to undertake legal representation. *Gonter v. Hunt Valve Co.*, 510 F.3d 610, 618 (6th Cir. 2007). A district court may look to "a party's submissions, awards in analogous cases, state bar association guidelines,

and its own knowledge and experience in handling similar fee requests." *Van Horn v. Nationwide Pro. & Cas. Ins.*, 436 F. App'x 496, 499 (6th Cir. 2011). Furthermore, while the district court may take into consideration an attorney's skill level in identifying the market rate, this Circuit holds that "reasonable" fees need not be "liberal" fees, and that "[s]uch fees are different from the prices charged to well-to-do clients by the most noted lawyers and renowned firms in a region." *Coulter*, 805 F.2d at 149.

Where a fee applicant seeks to recover fees for an out-of-town specialist, the district court must determine "(1) whether hiring the out-of-town specialist was reasonable in the first instance, and (2) whether the rates sought by the out-of-town specialist are reasonable for an attorney of his or her degree of skill, experience, and reputation." *Hadix v. Johnson*, 65 F.3d 532, 535 (6th Cir. 1995). If competent counsel was readily available locally at a lower charge or rate, the district court may apply local market rates to the services provided by the out-of-town specialist. *Id*. at 535, 536. Although "special skill and experience of counsel should be reflected in the reasonableness of the hourly rates," *Blum*, 465 U.S. at 898, "[s]ection 1988 does not guarantee civil rights plaintiffs the best counsel in the country; it guarantees them competent counsel," *Hadix*, 65 F.3d at 535. Further, the mere fact that a particular attorney "has a national reputation for expertise in [the relevant] kind of litigation does not constitute proof that [the attorney's] expertise was necessary" to the litigation. *Id*.

Defendants point to the rates awarded in several analogous cases from Southern Ohio. *See Ohio Right to Life Soc'y v. Ohio Elections Comm'n (ORTL)*, 590 F. App'x 597, 602 (6th Cir. 2014) (affirming district court's reduction of requested hourly rates ranging from $445 to $465/hour by lead attorney to $250/hour following a preliminary injunction and a consent judgment in a civil rights action for work performed between 2008 and 2010); *Hunter v. Hamilton Cnty. Bd. of Elections*, No. 1:10cv820, 2013 WL 5467751, at *17 (S.D. Ohio Sept. 30, 2013) (awarding McTigue $400/hour, McGinnis $250/hour, and Chandra $410/hour in 2010-12 on same law at issue in this case); *Libertarian Party of Ohio v. Husted*, No. 2:11-cv-722, 2013 WL 4833033, at *4-5 (S.D. Ohio Sept. 11, 2013) (Marbley, J.) (awarding $300/hour from requested rate of $350/hour for work performed in 2011-12 to challenge rules governing ballot

access in Ohio elections because counsel ultimately obtained all of the relief sought); *Harkless v. Brunner*, No. 1:06 CV 2284, 2011 WL 2149138, at \*4 (N.D. Ohio May 31, 2011) (adopting rates applied in *Project Vote* in a voting rights challenge); *NEOCH v. Brunner*, No. 2:06-cv-896, 2010 WL 4939946, at \*7 (S.D. Ohio Nov. 30, 2010) (Marbley, J.) (finding Chandra's requested rate of $400/hour and Gentry's requested rates of $280/hour and $290/hour reasonable for work performed  preparing their first two motions for attorneys' fees in connection with 2006 and 2007 litigation *sub judice*, during the appeal of those motions, and negotiating the Decree), *aff'd NEOCH v. Secy of Ohio*, 695 F.3d 563 (6th Cir. 2012); *Moore v. Brunner*, No. 2:08-cv-224, 2:08-cv-555, 2010 WL 317017, at \*2-3 (S.D. Ohio Jan. 10, 2010) (order) (rejecting requested rates of $400 and $450 as exceeding the amount necessary to encourage competent lawyers to take the case; finding $250/hour adequate but also applying a multiplier of 1.25 to reflect the exceptional results obtained in the cases); *NEOCH v. Brunner*, 652 F. Supp. 2d 871, 885 (S.D. Ohio 2009) (Marbley, J.) (noting that three attorneys, including Chandra, requested hourly rates above $300/hour for work performed between 2006 and 2008, stating that "[e]ach of those attorneys has substantial expertise in litigating not only civil rights cases, but more specifically election law civil rights actions" and that the requested billing rates for those attorneys (from $280 to $395 per hour) is reasonable and comparable to the rates of other attorneys of similar skill and experience in Columbus, Ohio"); *Ray v. Franklin Cnty. Bd. of Elections*, No. 2:08-CV-1086, 2009 WL 1542737, at \*5 (S.D. Ohio June 2, 2009) (approving $350/hour for lead counsel in election law case); *Project Vote v. Blackwell*, No. 1:06-CV-1628, 2009 WL 917737, at \*14 & n.11 (N.D. Ohio Mar. 31, 2009) (noting that the plaintiffs failed to present evidence as to reasonable hourly rates in the Northern District of Ohio or that they required an out-of-town specialist, and relying on an Ohio State Bar publication and its own experience to grant an award of $310-$450/hour to partners in complex election law case in 2006-07, including $400/hour to McTigue and $175/hour to McGinnis).

The district court relied on three of those cases.  First it noted that in *Libertarian Party of Ohio v. Husted* (*LPO*), a voting rights case challenging an Ohio law governing ballot access, the plaintiffs achieved a preliminary injunction, which was vacated on appeal because the bill was repealed.  Noting that fees in similar cases ranged from $300-$400, the district court (Judge

Marbley) in *LPO* rejected plaintiffs' counsel's request for $350/hour and instead awarded $300/hour as sufficient to attract competent local counsel.

In *Hunter*, Chief Judge Dlott, after undertaking an extensive analysis of the proper attorney rates in the District, awarded a fee of $410/hour for certain experienced counsel, including Chandra. The court consulted the rates set by the 1983 Rubin Committee, with a 4% cost-of-living adjustment. 2013 WL 5467751, at *17. The *Hunter* court remarked that the requested rates were

> below the rates awarded to other plaintiff's attorneys in Ohio with similar years of experience. For example, in 2010, this Court awarded fees to the following attorneys at the following rates: Jim Helmer (admitted 1975)—$498 per hour; Frederick Morgan, Jr. (admitted 1983)—$500 per hour; Julie Popham (admitted 1992)—$425 per hour; and Jennifer Verkamp (admitted 1996)—$450 per hour. *U.S. ex rel. Ellison v. Visiting Physicians Ass'n, P.C.*, No. 1:04–cv–220, 2010 WL 2854137 (S.D.Ohio July 19, 2010). The prior year, the District Court approved experienced counsel rates ranging from $351 to $497 per hour in an ERISA matter. *West*, 657 F.Supp.2d at 934. And in 2009, the District Court awarded fees to Mr. McTigue at $400 per hour and Mr. McGinnis at $250 per hour. *Project Vote v. Blackwell*, No. 1:06cv1682, 2009 WL 917737 (N.D.Ohio March 31, 2009). And the Sixth Circuit recently affirmed a decision from the Northern District of Ohio in which the court approved rates ranging from $250 to $450 per hour, depending on each attorney's experience. *Van Horn v. Nationwide Prop. and Cas. Ins. Co.*, 436 F. App'x 496, 499 (6th Cir.2011).

*Id.*

In a prior ruling in the case *sub judice*, the same district court (Judge Marbley) awarded rates ranging from $325/hour to $400/hour for fees related to work performed from January 2009 to April 2010 for briefing and arguing the plaintiffs' prior motions for fees and costs; opposing and settling the State of Ohio's appeal of this court's award of fees; and negotiating the Decree. *NEOCH*, 2010 WL 4939946, at *2. Chandra was awarded fees at a rate of $400/hour and Gentry at a rate of $290/hour. *Id.* at *7. (Altshuler Berzon had not yet been hired to represent the NEOCH Plaintiffs.)

Defendants direct our attention to *ORTL*, where the district court rejected $450/hour rates during the relevant time frame for "experienced attorneys litigating election-law actions."

*ORTL*, No. 2:08-cv-492, 2013 WL 5728255, at *6 (S.D. Ohio Oct. 22, 2013) (magistrate judge's ruling) (adopted with modification by 2014 WL 234677). The magistrate judge in that case relied on *Moore v. Brunner*, an election law action litigated in a similar time frame in the Southern District of Ohio, which held that "'an hourly rate of $250 is adequate to attract competent counsel'" within the venue and would not produce a windfall for attorneys. *Id.* (quoting *Moore v. Brunner*, No. 2:08-cv-224, 2010 WL 317017, at *3 (S.D. Jan. 25, 2010)). This applied to counsel who "'enjoy[ed] high levels of experience and expertise.'" *Id.* (quoting *Moore*, 2010 WL 317017, at *2). The *Moore* court relied on a survey of the 250 largest law firms in the country, including three Ohio firms. The partner fee rates for the Ohio firms were $220 to $495, $225 to $490, and $200 to $475. *Moore*, 2010 WL 317017, at *3.

This court affirmed those rates, crediting the district court's reliance on "the thorough analysis set forth in *Moore*":

> While courts have approved higher hourly rates, it was within the district court's "broad discretion" to rely on the thorough analysis set forth in *Moore* to determine an appropriate hourly rate for calculating the lodestar. *Wayne*, 36 F.3d at 533. The underlying actions in *Moore* involved election law disputes during the same time frame as the instant action, and the *Moore* court based its $250 hourly rate on the hourly rates billed by law firms in the relevant geographic region. Furthermore, while the district court may take into consideration an attorney's skill level in identifying the market rate, this Circuit has consistently held that "reasonable" fees need not be "liberal" fees, and that "[s]uch fees are different from the prices charged to well-to-do clients by the most noted lawyers and renowned firms in a region." *Coulter v. State of Tenn.*, 805 F.2d 146, 149 (6th Cir.1986). Accordingly, the district court did not abuse its discretion in basing its lodestar calculations on an hourly market rate of $250.

*ORTL*, 590 F. App'x at 602. Defendants also point out that the same district court (Judge Marbley) reduced the rate of an attorney with over twenty years of experience from $350 to $300/hour for 2011 work in *LPO*. *See LPO*, 2013 WL 4833033, at *4-5.

Nonetheless, as we observed in *ORTL*, "courts have approved higher hourly rates." *ORTL*, 590 F. App'x at 602. Given the district court's broad discretion we cannot say that the district court abused it in awarding the Ohio attorneys, who have substantial experience and expertise in election law cases, their prevailing market rates other than McTigue ($450/hour

instead of $550/hour) and Chandra ($425/hour instead of $435/hour), since those amounts are not out-of-line with other cases in the venue of record).  *See Hadix*, 65 F.3d at 536 (observing that "normal billing rates usually provide an efficient and fair short cut for determining the market rate" (internal quotation marks and citation omitted)); *see also Waldo v. Consumers Energy Co.*, 726 F.3d 802, 822 (6th Cir. 2013) (district court did not abuse its discretion in awarding hourly rate of $400/hour, although "on the high end," where the court found that lead counsel was a "highly respected, experienced and accomplished practitioner in civil rights and employment litigation" and the rate was not outside the range of reported rates for highly experienced attorneys in the area).  Furthermore, the district court distinguished *LPO*, noting the complexity of the *NEOCH*/*SEIU Local 1* cases and the greater amount of labor required.  Sept. 29, 2014 Op., at 26.

But the rates for the Altshuler Berzon attorneys are a different story.  They clearly are out of step with the local market, and the district court did not explain why the rates for these attorneys are higher than the comparable Ohio attorneys in the case or even how it calculated the reductions for the Altshuler Berzon attorneys.  For example, Gentry from Porter Wright in Columbus, Ohio charged $350/hour, her actual rate in 2012.  Gentry graduated from Yale Law School in 1995, was a federal clerk, and is a partner at a prominent Columbus firm.  Yet seven attorneys from Altshuler Berzon with less experience billed a higher rate than Gentry.  Four such attorneys (Leyton, Leonard, Chisholm, and Thoreen) received $100/hour more than Gentry.  Weissglass, an attorney with one more year of experience, received $200/hour more.

Plaintiffs offered the declaration of Daniel R. Mordarski, who attested that Altshuler Berzon attorneys "have a long history of successfully engaging in sophisticated and complex litigation at all level[s] of federal and state court, including in a number of significant elections cases" and that their hourly rates were comparable to the typical rates for top lawyers in Ohio firms like Jones Day, Squire Sanders (now Squire Patton Boggs), and Baker & Hostetler.  *NEOCH*, No. 2:06-cv-896, ID# 14072-73.  Plaintiffs, however, have not claimed that the Altshuler Berzon attorneys were out-of-town specialists whose expertise was necessary in this Ohio case.  The mere fact that Altshuler Berzon attorneys may have a national reputation for

expertise in election law litigation is not proof that their expertise was necessary in this litigation. *See Hadix*, 65 F.3d at 535. Absent any explanation for the differential rates between Altshuler Berzon attorneys and local counsel, we are required to hold that the district court abused its discretion and remand for recalculation of the rates of the Altshuler Berzon attorneys in accordance with the legal principles outlined above, along with a suitable explanation as to how it reached its conclusions.

The district court's rejection of a report by the Ohio State Bar Association, "The Economics of Law Practice in Ohio in 2013" (OSBA Report), as a comparison point was not an abuse of discretion. The survey set forth billing rates of 1000 Ohio private practitioners, only about half of the active attorneys in Ohio, and it does not provide information regarding the skill, experience, and reputation of those who responded. The report, "by its own terms," states that it was "'not intended for use in setting minimum, average, or maximum attorney fees or salaries.'" Sept. 29, 2014 Op., at 25 (quoting OSBA Report at 4). The author of the report explained that it "significantly understates" rates because many attorneys failed to respond. *Id.* at 26 (quoting OSBA Report at 5). Finally, the data available for civil rights attorneys (twenty-six in all) was similar to the rates sought by Plaintiffs--$400-500/hour for primary civil rights lawyers, and $300-$550 /hour for partial civil rights practitioners. *Id.*

## VI. CROSS-APPEAL

Plaintiffs argue that the district court should have declined to apply the *Coulter* 3% rule because "unusual circumstances" justified a higher award. Plaintiffs and Amici also urge us to abandon the *Coulter* presumptive cap altogether. We agree that intervening Supreme Court authority has undermined *Coulter's* presumptive cap for fees for fee awards and therefore abrogate that ruling today. Accordingly, we need not address Plaintiffs' argument that "unusual circumstances" warranted a departure from the rule. We now turn to our reasons for abrogating *Coulter*.

At issue is *Coulter's* holding that

[i]n the absence of unusual circumstances, the hours allowed for preparing and litigating the attorney fee case should not exceed 3% of the hours in the main case

> when the issue is submitted on the papers without a trial and should not exceed
> 5% of the hours in the main case when a trial is necessary.

*Coulter*, 805 F.2d at 151. Plaintiffs and Amici claim that a presumptive cap for fee awards in support of a successful fee petition is inconsistent with intervening Supreme Court precedent, namely *Commissioner, I.N.S. v. Jean*, 496 U.S. 154 (1990). Although this court has reaffirmed the *Coulte*r rule in the twenty-five years since *Jean* was decided, *see, e.g.*, *NEOCH*, 695 F.3d at 574 (and cases cited therein); *Gonter*, 510 F.3d at 620-21, we have not examined whether *Jean*, which was decided four years after *Coulter*, calls for a re-examination of its presumptive cap. Although one panel may not disturb the ruling of a prior panel absent en banc review, *see* 6th Cir. R. 32.1(b) ("Published panel opinions are binding on later panels."); *Valentine v. Francis*, 270 F.3d 1032, 1035 (6th Cir. 2001) (holding that en banc review is required to overrule a prior published opinion), an intervening Supreme Court decision gives us the right to revisit this question, *see Collard v. Kentucky Board of Nursing*, 896 F.2d 179, 183 (6th Cir. 1990). This is true even in the unusual situation where binding circuit precedent overlooked earlier Supreme Court authority. *Ballinger v. Prelesnik*, 709 F.3d 558, 561-62 (6th Cir. 2013) (holding that the rule for habeas review in *Brown v. Smith*, 551 F.3d 424 (6th Cir. 2008), had been called into doubt by *Harrington v. Richter*, 562 U.S. 86 (2011), even though *Robinson v. Howes*, 663 F.3d 819, 823& n.2 (6th Cir. 2011), which was decided after *Harrington*, applied *Brown*); *see also Atl. Thermoplastics Co. v. Faytex Corp.*, 970 F.2d 834, 838 n.2 (Fed. Cir. 1992) ("A decision that fails to consider Supreme Court precedent does not control if the court determines that the prior panel would have reached a different conclusion if it had considered controlling precedent."); *Tucker v. Phyfer*, 819 F.2d 1030, 1035 n.7 (11th Cir. 1987) (holding that the court may disregard prior panel decision that failed to reference previous Supreme Court opinions and stating that "we do not view ourselves as violating the prior panel rule; rather, we are simply discharging our duty to follow clearly controlling Supreme Court precedent"); *Wilson v. Taylor*, 658 F.2d 1021, 1035 (5th Cir. Unit B 1981) (in the "unusual and delicate situation" where a prior circuit case did not consider the impact of intervening Supreme Court precedent, the court must apply the Supreme Court decision, not the later-issued circuit case).

It is also true that the intervening Supreme Court authority need not be precisely on point, if the legal reasoning is directly applicable. *See, e.g.*, *Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1326 (Fed. Cir. 2014) (holding that issues decided by an intervening Supreme Court case "need not be identical to be controlling") (and cases cited therein)); *Sierra Club v. Korleski*, 681 F.3d 342, 351-52 (6th Cir. 2012) (choosing "not to extend" the holding of a prior Sixth Circuit case comparing a Clean Air Act provision to a different but related CAA provision because the reasoning of the prior Sixth Circuit case (1) was "dubious at best," (2) was "irreconcilable with the Supreme Court's later construction of a nearly identical provision" addressed in an intervening Supreme Court case, and (3) "came during an era whose conception of the state-federal relationship has been superannuated by" later Supreme Court decisions); *Barr v. Lafon*, 538 F.3d 554, 571 (6th Cir. 2008) (noting that subsequent panel properly rejected prior panel decision in light of intervening Supreme Court authority applied to an analogous setting); *Primax Recoveries, Inc. v. Gunter*, 433 F.3d 515, 518-19 (6th Cir. 2006) (intervening Supreme Court decisions interpreting Federal Rules of Bankruptcy and Criminal Procedure addressing term "jurisdiction" caused this court to revisit whether it lacked jurisdiction over an ERISA claim); *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) ("We hold that the issues decided by the higher court need not be identical to be controlling. Rather, the relevant court of last resort must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable."); *Troy*, 758 F.3d at 1326 (stating that lower courts are "bound not only by the holdings of higher courts' decisions but also by their 'mode of analysis'" (citing Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1177 (1989)).

Plaintiffs and Amici make compelling arguments for abrogating the *Coulter* cap. First, they claim that *Coulter* is inconsistent with the reasoning in *Jean*. *Jean* addressed a similar issue under the Equal Access to Justice Act (EAJA), a fee-shifting statute similar to § 1988. In *Jean*, the Supreme Court rejected the notion that recovering fees for the fees stage of litigation should be subject to a different standard than recovering for the merits stage. *Jean*, 496 U.S. at 160-62. The government in *Jean* argued that the prevailing plaintiffs in an EAJA case must make a separate showing that the government's position in opposing the fee award was not

"substantially justified," even though the plaintiffs had already shown that the government's position on the merits was not substantially justified (as required by the EAJA). *Id.* The *Jean* Court rejected the argument that the two stages of litigation should be treated separately for purposes of EAJA, stating: "The single finding that the Government's position lacks substantial justification, like the determination that a claimant is a 'prevailing party,' . . . operates as a one-time threshold for fee eligibility." *Id.* at 160. "While the parties' postures on individual matters may be more or less justified, the EAJA—like other fee-shifting statutes—favors treating a case as an inclusive whole, rather than as atomized line-items." *Id.* at 161–62.

The *Jean* Court looked to the *Hensley* reasonableness formulation for determining the amount of fees for fees, stating that "once a private litigant has met the multiple conditions for eligibility for EAJA fees,[12] the district court's task of determining what fee is reasonable is essentially the same as that described in *Hensley.*" *Id.* at 161; *see also id.* at 163 n.10 ("[*Hensley*] requires the district court to consider the relationship between the amount of the fee awarded and the results obtained . . . ."). The *Jean* Court dismissed the government's argument that allowing an automatic award of fees for fees would encourage exorbitant fee requests, generate needless litigation, and unduly burden the federal fisc, stating that the district court can "recognize and discount" improper claims. *Id.* at 162-63. The *Jean* Court also noted that, under *Hensley*, which requires consideration of whether fees have been incurred relative to successful or unsuccessful claims in a case, "fees for fee litigation should be excluded to the extent that the applicant ultimately fails to prevail in such litigation." *Id.* at 163 n.10.

*Jean's* reliance on *Hensley's* reasonableness formulation at the fees for fees stage in AJA litigation preordains the conclusion that the reasonableness formulation applies to the fees on fees stage of § 1988 too. To put it another way, if EAJA, which is just "like other fee-shifting statutes," *id.* at 161, looks to *Hensley*, then this court can decide that the *Hensley* reasonableness formulation likewise applies to the fees stage of § 1988 litigation. As *Jean* highlights, a

---

[12]To be eligible for a fee award under the EAJA, (1) the claimant must be a "prevailing party"; (2) the Government's position must be "substantially justified"; (3) there must be no "special circumstances make an award unjust"; and (4) any fee application must be submitted to the court within 30 days of final judgment in the action and be supported by an itemized statement. 28 U.S.C. § 2412(d)(1)(A), (B).

presumptive cap lacks textual support and is not needed to ward off exorbitant fees and protracted litigation. The district court can correct any abuses at the fees for fees stage under the "reasonableness" standard.

The presumptive cap mostly takes away the discretion afforded to the district court in the statute. *See* 42 U.S.C. § 1988(b) ("[T]he court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . .").[13] Congress knows how to set caps on fee applications and has done so in other contexts, yet it did not do so in § 1988. *See, e.g., Baker Botts LLP v. ASARCO LLC*, 135 S. Ct. 2158, 2165 (2015) (concluding that a fee-shifting provision in the Bankruptcy Code does not allow for "[t]ime spent litigating a fee application"); *In re Meese*, 907 F.2d 1192, 1203 (D.C. Cir. 1990) (holding that the Independent Counsel Reauthorization Act does not permit fees claimed for the preparation of a fee application); *cf. Kaseman v. Dist. of Columbia*, 444 F.3d 637,643 (D.C. Cir. 2006) (holding that fee-cap provision in the Individuals with Disabilities Education Act applies to both merits time before administrative agency and fees for fees time in court). Section 1988 does not contain a similar limitation. *See Jama v. ICE*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply . . . .").

The legislative history further suggests that Congress envisioned a "reasonable" attorney's fees for fees award. *See* S. Rep. No. 94-1011, at 2 (1976) (stating that "[i]f private citizens are to be able to assert their civil rights, and if those who violate the Nation's fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate these rights in court"); *Hensley*, 461 U.S. at 429 (stating that § 1988 ensures "effective access to judicial process" for civil rights plaintiffs.) (quoting H.R. Rep. No. 94-1558, at 1 (1976)). Indeed, in acknowledging that fees for fees are recoverable under § 1988, this court observed that "[i]f a successful party in a civil rights suit is awarded attorney's fees under the Act and he cannot secure attorney's fees for legal services needed to

---

[13]To be sure, *Coulter* created an exception for "unusual circumstances" to justify a departure from the presumptive cap. However, the plain language of the statute gives the district court that discretion.

defend the award on appeal, the underlying Congressional purpose for the Act would be frustrated." *Weisenberger v. Huecker*, 593 F.2d 49, 54 (6th Cir. 1979). The Senate Report for amendment of § 1988 cited with approval *Stanford Daily v. Zurcher*, 64 F.R.D. 680 (N.D. Cal. 1974), *aff'd*, 550 F.2d 464 (9th Cir. 1977), *rev'd on other grounds*, 436 U.S. 547 (1978). *See* S. Rep. No. 94-1011, at 6, reprinted in U.S. C.C.A.N. 5908, 5913; *Stanford* noted the "federal court decisions which make no distinction, in calculating fees, between attorney hours spent on the merits and on the issue of counsel fees" and held that denying fees on fees awards "would allow parties to dilute the value of a fees award by forcing attorneys into extensive, uncompensated litigation in order to gain any fees." *Stanford*, 64 F.R.D. at 683-84; *see also Gagne v. Maher*, 594 F.2d 336, 344 (2d Cir. 1979) (legislative history "impliedly" supported fully compensatory fees for fee awards because Senate Report cited *Stanford*); *Johnson v. Mississippi*, 606 F.2d 635, 638 (5th Cir. 1979) (same).

Plaintiffs and Amici also attack the reasoning of *Coulter* itself. *Coulter* justified the presumptive cap on the following grounds:

> Although time spent in preparing, presenting, and trying attorney fee applications is compensable; some guidelines and limitations must be placed on the size of these fees. Otherwise the prospect of large fees later on may discourage early settlement of cases by rewarding protracted litigation of both the civil rights case and the attorney fee case.

> The cases from this and other circuits uniformly hold that a lawyer should receive a fee for preparing and successfully litigating the attorney fee case after the original case is over, although in the private market place, lawyers do not usually charge, and clients do not usually pay, for the time it takes lawyers to calculate their fees. *See* cases collected and discussed in *In re Nucorp Energy, Inc.*, 764 F.2d 655, 660 (9th Cir. 1985). The legislative intent behind attorney fee statutes, however, was to encourage lawyers to bring successful civil rights cases, not successful attorney fee cases. The attorney fee case is not the case Congress expressed its intent to encourage; and in order to be included, it must ride piggyback on the civil rights case.

*Coulter*, 805 F.2d at 151.

But the only case cited, *In re Nucorp Energy, Inc.*, 764 F.2d 655 (9th Cir. 1985), actually supports fully compensatory awards of fees for fees, and it cited cases from other circuits doing the same. *Nucorp* adopted the reasoning of the Third Circuit:

> If an attorney is required to expend time litigating his fee claim, yet may not be compensated for that time, the attorney's effective rate for all the hours expended on the case will be correspondingly decreased. Recognizing this fact, attorneys may become wary about taking Title VII cases, civil rights cases, or other cases for which attorneys' fees are statutorily authorized. Such a result would not comport with the purpose behind most statutory fee authorizations, viz, the encouragement of attorneys to represent indigent clients and to act as private attorneys general in vindicating congressional policies. Indeed, courts have consistently held that attorneys may be awarded, under statutory fee authorizations, compensation for the expenses of and time spent litigating the issue of a reasonable fee-i.e. for time spent on the fee application and successful fee appeals.

*Nucorp*, 764 F.2d at 660-61 (quoting *Prandini v. Nat'l Tea Co.*, 585 F.2d 47, 53 (3d Cir. 1978)). In fact, *Prandini* cautioned in general against reducing fees by an arbitrary figure: "district courts, in awarding attorneys' fees, may not reduce an award by a particular percentage or amount (albeit for justifiable reasons) in an arbitrary or indiscriminate fashion[,] . . . [but] must analyze the circumstance requiring the reduction and its relation to the fee, and it must make specific findings to support its action." *Prandini*, 585 F.2d at 52.

Moreover, the policy goals for the cap on fee awards identified in *Coulter* lack a logical connection to the rule itself. *Coulter* justified the 3% presumptive cap as serving several goals, including (1) to model the private marketplace, (2) to ensure proportionality, (3) to encourage settlement, and (4) to honor the intent of § 1988. *See Coulter*, 805 F.2d at 151.

First, preparing and supporting a fee application is more strenuous than invoicing an hourly client in the marketplace because much more detail and proof is required under § 1988. Unlike privately paid attorneys, civil rights attorneys must support their bills with expert affidavits, distinguish between time spent on successful and unsuccessful claims, defend their billing rates, and compare them to similar attorneys. Such documentation is required for even the most basic fee petition if counsel are to meet their burden of proof.

Second, most of the mandatory work required to support a fee petition is entirely independent of the amount of work required to succeed on the merits of a civil rights case, and in any event, *Coulter* does not explain why the proportion should be 3%. By not compensating for work seeking fees, the practical effect is to diminish the value of attorneys' fees awarded for the entire case, including the work on the merits.

Third, the *Coulter* cap encourages plaintiffs to accept unjustifiably low settlement terms to avoid a lengthy fee dispute resulting in a less-than-compensatory fee award. Conversely, it creates an incentive for defendants (typically governmental agencies) to push the fee litigation beyond the 3% cap and use the prospect of numerous hours of uncompensated time as leverage for a lowball settlement proposal. *See, e.g., ABC v. Brunner*, No. 1:04-cv-750, 2008 U.S. Dist. LEXIS 119364, at *18-19 (S.D. Ohio Sept. 30, 2008) (refusing to impose 3% cap for litigating attorneys' fees award where the Secretary's "impenitent strategy resulted in the voluminous number of hours spent on this case" and finding that the plaintiffs' counsel would "not be punished for responding to such litigation strategy with the fervor and diligence necessary to ethically advocate").

Fourth, and most importantly, as already stated, the *Coulter* rule is inconsistent with the purpose of § 1988's fee-shifting provision, which "is to ensure 'effective access to the judicial process' for persons with civil rights grievances." *Hensley*, 461 U.S. at 429 (quoting H.R. Rep. No. 94–1558, at 1 (1976)). In *Weisenberger* we recognized that diluting the overall fee award by failing to provide fully compensatory fees for fees undermines the congressional intent behind a fee-shifting statute, which is "to encourage the private prosecution of civil rights suits through the transfer of the costs of litigation to those who infringe upon basic civil rights." *Weisenberger*, 593 F.2d at 53-54.

Recently, in related litigation, Judge Moore "question[ed] the continued vitality of the three-percent rule," perceiving "no justification in the statute or legislative history for divesting the district courts of their discretion to determine" fees for fee awards. *NEOCH*, 695 F.3d at 577 (Moore, J., concurring) (acknowledging that *Coulter* was binding Sixth Circuit precedent). No other circuit has adopted a bright-line cap on fees for fees compensation. *See id.* For example,

the Eleventh Circuit has held that fees for fees are "fully compensable." *See Martin v. Univ. of S. Ala.*, 911 F.2d 604, 610 (11th Cir. 1990); *see also Hernandez v. George*, 793 F.2d 264, 269 (10th Cir. 1986) ("Compensating attorneys for work in resolving the fee issue furthers the purpose behind the fee authorization in § 1988 which is to encourage attorneys to represent indigent clients and to act as private attorneys general in vindicating federal civil rights policies." (citing *Prandini*, 585 F.2d 47)); *Gagne*, 594 F.2d at 344 (adopting *Prandini* view) (and cases cited therein)).

In light of *Jean*, we abrogate the *Coulter* rule that limits the hours allowed for preparing and litigating the attorney fee case to 3% of the hours in the main case when the issue is submitted on the papers without a trial and to 5% of the hours in the main case after a trial. *Coulter* is otherwise unaffected. Given this conclusion, it is necessary for us to remand to the district court to determine reasonable attorneys' fees for the hours expended by Plaintiffs in seeking their fee award.

## VII. CONCLUSION

As to the appeal, the judgment of the district court is AFFIRMED as to the hours awarded, is VACATED as to the hourly rates of the Altshuler Berzon attorneys, and REMANDED for detailed findings consistent with this opinion. As to the cross-appeal, *Coulter* is abrogated to the extent that it holds that fees for seeking fees are limited to 3% and 5% of the hours in the merit award, and the district court's award of fees for fees is VACATED and REMANDED for findings consistent with this holding.